## E. D. STRANG v. THE STATE.

*No. 5. Decided May 27.*

1. **Forgery by Altering Written Instrument—Endorsement of Negotiable Note.**—The fraudulent endorsement of the name of the payee upon an existing valid negotiable note, is forgery by alteration, under article 432 of the Penal Code.

2. **Same—Indictment—Passing Forged Instrument.**—Where a negotiable instrument has been altered and forged, by endorsement of the name of the payee, an indictment for passing or uttering the same is not contradictory, duplicitous, or defective because in one portion it describes the entire instrument as forged, and in another portion charges that appellant knew the endorsement was forged; and an allegation in effect that the accused did fraudulently

pass as true the forged instrument. knowing the endorsement to be forged, sufficiently charges, under provision of article 443, Penal Code, the offense of knowingly passing as true a forged instrument.

3. Same—Evidence—Act of Innocent Agent.—Where, on a trial for passing a forged instrument, it was made to appear that the same was passed in another county (after it was forged) by an agent and clerk of and under instructions from the defendant, held, that the clerk being the innocent agent of defendant. his act was the act of defendant, and admissible as evidence against the defendant.

4. Charge of Court—Weight of Evidence—Agency.—Where there is no question or issue raised as to agency, a charge which assumes that fact is not obnoxious to objection that it is upon the weight of evidence.

5. Evidence—Confession—Cognate Crimes—Intent.—At the time of defendant's arrest, and in the same conversation in which he confessed that he forged the instrument in question, he also confessed he had embezzled other funds. Held, the latter confession was admissible to throw light on the intent of defendant. But see below opinion of Judges HURT and DAVIDSON as to this proposition.

6. Same—Extraneous Facts — Charge of Court Restricting and Limiting Evidence of, when Necessary — Failure to do so, when Reversible Error.—Where extraneous facts are introduced, because parts of the res gestæ, or as matter of inducement, or where the same character of crime is shown, which might, if not explained or limited, exercise a wrong, undue. or improper influence upon the jury in their consideration of the main issue: Held, it will constitute reversible error if the court should. in its charge, fail or omit to limit and restrict such evidence to its legitimate purposes.

7. Same—Practice on Appeal.—On appeal, the question always is, Did the failure of the court to limit the evidence injure defendant? If there is nothing to show that the jury were improperly misled, this court will not, in the absence of requested instructions, or where there is a failure to except to the charge, reverse the case.

8. See opinion of Judges HURT and DAVIDSON concurring in the affirmance of the judgment, notwithstanding the admission of certain evidence which was inadmissible.

APPEAL from the District Court of Nolan.    Tried below before Hon. WILLIAM KENNEDY.

Appellant was charged by indictment with knowingly and fraudulently passing as true a forged instrument in writing. The charging part of the indictment is as follows, viz.: " Did then and there willfully, knowingly, and fraudulently pass as true, to R. L. McCauley, a forged instrument in writing, to the tenor following:

" No. 8.                          SWEETWATER, TEXAS, Feb. 16, 1889.

"Thomas Trammell & Co., Bankers:

" Pay to A. Rawlins — order eighty-five dollars.
" $85.00.                                   R. W. MILLSAP."

" Endorsed on the back thereof 'A. Rawlins,' which endorsement, to-wit, 'A. Rawlins,' on the back of said instrument, the said E. D. Strang

then and there knew to be forged, and did then and there so pass the same as true, with the intent to injure and defraud; which said instrument in writing also contained the endorsement on the back thereof ' S. W. Thomas,' written thereon after the said name 'A. Rawlins' had been endorsed thereon.''

At the trial appellant was convicted, and his punishment assessed at two years confinement in the penitentiary.

Defendant filed a motion to quash the indictment, '' first, because it charged no offense known to the law; second, because the same is contradictory in its averments, in this, the instrument set out in the indictment is all alleged to be forged, but the indictment only charges defendant with a knowledge that the endorsement was forged.'' This motion to quash was overruled.

The statement of facts is quite voluminous, but, in substance, the testimony is as follows:

A. Rawlins, for State, testified as follows:  I reside in Parker County, Texas.  Know the defendant.  He resides in Fisher County.  Here the witness was shown the instrument charged by indictment to have been forged, and he said: ''A. Rawlins'' endorsed on the back of this instrument is not my writing.  I did not put it there, nor did I authorize defendant or any one else to put it there.

The witness testified, that in 1889, R. W. Millsap owed him $85 for a tombstone; that he wrote him two letters about the pay for the same; got no reply, and then about May, 1889, sent him a registered letter on the subject.  Defendant, Strang, never paid him for the tombstone, nor wrote to witness about it.  The check or draft drawn by Millsap, which is set out in the indictment, was never in witness' possession, and he had never seen it until he saw it at court.  In June, 1885, Millsap paid him the $85 that he owed him, in money.

R. W. Millsap, for the State, testified:  Know defendant, and knew him several years prior to 1889.  He was merchant and postmaster at Fisher, Fisher County, Texas.  On the 16th of February, 1889, I was residing in Stonewall County, Texas, about twenty miles north of Fisher, in Fisher County.  On that day defendant and his wife came to my house, and defendant handed me a letter from A. Rawlins, in which Rawlins notified me that the tombstone for my child's grave was done, and asked me to send him the pay, $85.  I had money in the bank of Thomas Trammell & Co., in Sweetwater, Texas (Nolan County), and I then drew the draft in question, with a letter to A. Rawlins, and folded the letter and put the draft in it; put letter and draft in an envelope (prepaid), sealed it, and directed it to A. Rawlins, Weatherford, Texas, and handed it to defendant, in my house in Stonewall County, and told him to mail it for me at Fisher, and supposed he had done so.  In early May, defendant came to my house again, and I asked him if he brought

any mail for me, and he said, "No." His wife was with him. They stayed all night, and next day returned to Fisher. A few days afterwards, I went over to Fisher, and defendant was not at home. S. W. Thomas, Strang's clerk, told me there was a registered letter there for me. He searched in the postoffice for it, and looked over generally for it. He then took a postoffice key and unlocked Strang's private desk and found a registered letter. It was in reference to the gravestone and the $85, and threatening suit; the letter had been broken open. I got mad with Strang. Towards evening defendant returned, and I asked him about the registered letter. He replied, that he had received one, but had lost it on his way to my house the day he and his wife came out there, in Stonewall County, and failed to find it on his return. I told him, "Strang, I reckon you are the damnedest liar in the world," and pulled the letter out of my pocket and showed it to him, and he hung his head. I rounded him up and demanded a settlement with him. We had a settlement, and he owed me a balance of about $225. This $225 included all he owed me, the $85 Rawlins check included, and some money he had collected from Chamberlain. I did not authorize the defendant to open the letter addressed to A. Rawlins; did not authorize him to use the enclosed check, and did not authorize him to do anything with it, other than to mail the letter having the check enclosed in it.

A man named Chambelain owed me about $80. He lived in Boston, Massachusetts. I authorized defendant to collect that sum for me. I saw him several times, and asked him if he had got the money. He replied, No. I believed he had, and concealed the fact from me. Afterwards, when I met defendant and accused him of collecting the money from Chamberlain, and spent it, he admitted that he had, and said that he intended to fix it up satisfactorily. I replied, "I reckon, Strang, you are the damnedest liar in the world." This was when I first accosted him about the registered letter, and at the time we had the settlement above mentioned, and a part of the same transaction and conversation. (This testimony was objected to and a bill of exceptions taken.) He then said he collected it. This sum was included in the note for $225. That note included all balance due me on a settlement after we bursted up and parted.

Cross-examined: Myself and defendant had been very intimate. So had our families. Our arrangment was, that I placed with defendant money, $600 or $700, on which he was to pay no interest. He was to let me have money when I needed it; was to pay my orders on him; was to order goods as I needed them, pay for them, pay freight, and deliver to me as I needed them. I told him to answer my letters which came in my absence about some business affairs, but mentioned the particular ones; and was to let me have goods at cost and carriage. He also collected some debts due me. I authorized him to break open my business

letters and reply in my name; this only applied to some particular business letters, which he had bought or made some payments for me. He did this with Dulaney and others. When I asked him what he did with my letter to Rawlins, he said he opened it, took out the check, and got it cashed at the bank. Wanted the money to pay freight on his goods and a buggy and harness for me, to the extent of about $40, and used the balance of the money in his business. He was not my agent; had no authority to transact my business, except to collect a debt or two, and to pay Dulaney on account, and get the buggy from the depot. Afterwards S. W. Thomas and I called Strang out, and I asked him what made him tell Thomas that I was going to put the forgery off on Thomas, and he said he just did it to keep the little dunce quiet. I never did authorize the defendant to write the name A. Rawlins thereon, nor to use the check, but mail the letter and check to A. Rawlins. I did not write the name A. Rawlins on it, and it was not on it when I handed it to Strang.

S. W. Thomas, for the State, testified: In 1889 I lived at Fisher, and was clerk in Strang's store. About February 20 the defendant gave me the check shown to me in evidence, and told me to come to Sweetwater and get it cashed at a store, if I could, before the bank opened, and if not at a store, then at the bank, and to use so much of the money to pay freight as I needed, and to bring the balance back to Fisher. I came to Sweetwater, and next morning presented the check to R. L. McCauley, was identified, wrote my name, S. W. Thomas, across the back of the check, and got the $85 from R. L. McCauley; this was in Nolan County, Texas; paid freight on goods of defendant, and went back to Fisher and gave defendant the balance of the $85. When defendant gave me the check in Fisher, Texas, it had on it the name of A. Rawlins. I think it is defendant's handwriting. Afterwards, about May 10, 1889, Millsap came to Fisher and asked me if there was any mail for him. I replied, "Didn't Strang give you a registered letter?" He said, "No." I then said, "There has been one here several days for you." I looked for it in the postoffice, and could not find it. I then took a postoffice key and unlocked defendant's private desk, in another part of the store, and found the registered letter, and gave it to R. Millsap. It had been opened. Strang was then away from the store. When he returned that evening, Millsap rounded him up about it, and was very mad. Millsap demanded a settlement, and they settled.

R. L. McCauley, for the State, testified: I reside in Nolan County, Texas. I am cashier in the banking house of Thomas Trammell & Co., and a partner in the firm. I know the defendant. I have seen the check shown to me. On February 20, 1889, S. W. Thomas presented said check for payment at the counter of the banking house of Thomas Trammell & Co., in Sweetwater, Nolan County, Texas, and was identified, and I required him to write his name across the back of the paper, which he then

did, and I cashed it. R. W. Millsap had money to his credit in the bank, and I charged the amount called for in the paper ($85) to R. W. Millsap's account with the bank, and I stamped the check on its face with red ink then, "Trammell & Co., Sweetwater, Texas, February 20, 1889. Paid." Thomas told me at the time that he passed the check that Strang had sent it with him, Thomas, to get cashed. The check in evidence is the one.

The State then introduced the draft, with the endorsements thereon, to the introduction of which defendants, by counsel, objected, and excepted for the following reasons, viz.:

"1. The drawer of it has stated to the court and jury that the check is genuine, except the endorsement.

"2. That the indictment declared on a forged instrument in writing, setting it out by tenor.

"3. That the indictment alleges that the check was passed as true to R. L. McCauley, when the paper is drawn on Thomas Trammell & Co., bankers, and the evidence shows that it was passed to Thomas Trammell & Co., and not to R. L. McCauley.

"4. That defendant did not pass this instrument in writing in Nolan County, and was not present when S. W. Thomas passed it, and only had the instrument in his possession in Stonewall County and Fisher County.

"5. That Nolan County has no jurisdiction of the case.

"6. The venue of the case as to defendant is under the law in either Stonewall or Fisher County.

"7. On the ground of variance, in that the instrument offered in evidence is not the one set out in the indictment."

The court overruled the objection and admitted the paper in evidence to the jury, with all endorsements, to all of which defendant duly excepted.

E. D. Strang testified, for defense, as follows: Up to some eighteen months ago, and for about six years, I resided in Fisher County, Texas. Was living in Fisher County in 1889. For the last eighteen months have lived in Fort Worth and Dallas. I wrote the name of A. Rawlins across the back of the check. It came about in this way: I was in the mercantile business in Fisher County, and was also postmaster at Fisher, Texas, during the year 1888. R. W. Millsap left with me a consideaable sum of money, some six hundred and more dollars, with the understanding that I was to pay no interest on the deposit, but with the further understanding, that Millsap was to get all the goods and merchandise he might want at cost and carriage; that I was to advance money to him as he would call for it, pay all orders drawn on me by him, order goods for him, and pay freights thereon, and deliver them in Fisher, and attend to any and all of his business in his absence. I was also to open and read his letters, and reply to them. His exact language was, "You open and read my letters,

and reply to them, and do all of my business just as you would your own.'' And this I did faithfully, and Millsap never complained of the manner in which I managed his business and correspondence until he got mad about the registered letter. I opened, read, and replied to many letters for him. I paid his orders; let him have goods and money, and collected debts for him, and ordered goods for him, and paid freights for him. At one time I collected $400 for him from Mr. Beall. From time to time, when I would meet him, i. e., when he would come to Fisher, I would give him his letters, and tell him how I had replied to them, and explain anything to him; and he always expressed satisfaction till he got hot about a registered letter. I settled with parties with whom he could not agree, and he ratified my acts. I well remember two such settlements; one with Youngblood and one with Bob Yantis.

About February 16, 1889, I went up to Millsap's house, in Stonewall County, to carry his mail to him, and to talk to him about business, and to make him a visit. Our families were very intimate; his wife would come to Fisher and stay with my wife for a week or ten days at a time. He and I were very intimate also. While at his house on February 16, 1889, he drew the draft set out in the indictment and offered in evidence in this case. He put it in an envelope, whether sealed I do not recollect; I do not remember whether the letter was addressed to A. Rawlins; handed it to me, telling me there was a draft in the envelope for $85, in favor of A. Rawlins. I knew what the draft was for, as I had opened and read Rawlins' letter about the gravestone, and carried the letter to Millsap. He, Millsap, also told me to mail the letter when I went home. Next day I went back home and opened my mail; I found then I had goods in the depot at Sweetwater, and there was also there a buggy and set of harness for Millsap, upon which I was to pay freight, and which I was to bring from the depot to Fisher for Millsap. Having no money on hand, I took the draft drawn by Millsap in favor of A. Rawlins, and endorsed the name of A. Rawlins on the back of it, and gave it to S. W. Thomas, and told him to take a wagon and team and go to Sweetwater and get my freight and Millsap's buggy and harness, and bring the goods and buggy and harness; told him to cash the Millsap check at a store, if he could, so as to lose no time in waiting for the bank to open; but, if need be, to wait till the bank opened and cash it at the bank, pay the freight on Millsap's buggy and harness, pay freight on my goods, and bring all to Fisher. I suppose Thomas did all as I directed him, as he brought the buggy and harness and the goods home with him; and Millsap afterwards got the buggy and harness. He had told me to pay freight on the buggy and harness, and to bring them to Fisher for him. I credited him with the $85, and charged him with the freight.

Vol. XXXII. Crim.—15

I knew Millsap had money on deposit with Thomas Trammell & Co., and thought I had a right to direct the draft as I did, intending to send the $85 to A. Rawlins later on. Had no idea that it would make any difference with Millsap, as he had told me to do his business as I did my own. I thought my authority from Millsap gave me an unquestionable right to use the draft as I did. I had not put the letter and draft in the postoffice, and supposed it was all right for me to take it and use it as I did, as I was his agent. My idea about it was, that Millsap could do anything he pleased with the draft, and that I could do with it as he could.

I at once gave Millsap credit on the bank for the amount of the draft, $85. I deferred sending the money to Rawlins for a time, as money was very scarce, thinking it would make no difference, until some four or six months afterwards a registered letter came for Millsap from A. Rawlins. I opened the registered letter, as I had been doing all others of his letters, and placed it in a desk in the store. The desk had two keys to it, both of which were used about the postoffice. I kept postage stamps and some United States envelopes in the same desk. I put all business letters in that desk. The letter remained in that desk for a few days, when I decided to carry it over to Millsap. I intended to carry it, and thought I had taken it out of the desk when I started over to Stonewall County. But when I got to Millsap's house I did not have it, and thought I had lost it.

When I got to Millsap's, he asked me if I had any mail for him, and I told him no; did not tell him I had lost it. Knowing how queer he was, I would not stay all night, hoping to find the registered letter on my way home, and returned by the way I went; but I failed to find it. A day or two afterwards Millsap came over and asked me if I had a registered letter for him. I said, no, I lost it. He pulled the letter out of his pocket, and said, " You are a damned liar; here it is." I was surprised, as I thought I had lost it. He then cursed and abused me. I said nothing, as I wanted no difficulty with him. He then said he wanted a settlement. I made out his account, and was indebted to him in a balance of $225. I gave him security on personal property for such balance, and at the end of thirty days gave him a note with security for the $225 at ninety days, and the note was paid at maturity.

I was afterwards arrested for perjury, and had an examining trial before Judge Deming, in Roby. Millsap was a cattle man, and was away for three weeks to two months, and during all these intervals I attended to all of his business. I had no chance to confer with him for weeks at a time, and supposed I had authority to do all things in reference to his business, correspondence and all, just as if it had been my own business. I collected a draft of about $80 from a Mr. Chamberlain, of Boston, Massachusetts, in favor of R. W. Millsap, after considerable delay, and cred-

ited Millsap with it. The sum and the Rawlins draft were included in the $225 note. Millsap nor Rawlins never gave me authority to endorse the name on the back of the check, but I believed I had the authority to do it, as Millsap could, being Millsap's agent. I am a drummer, and was in business for several years, handling checks and drafts generally, as other merchants.

Mrs. Bertha Strang: The testimony of Mrs. Bertha Strang was corroborative of that of her husband.

*C. R. Breedlove* and *Thurmond & Yantis*, for appellant.—1. The court erred in overruling defendant's motion to quash the indictment. Penal Code, art. 443.

2. A variance between the check offered in evidence and the one set out in the indictment is fatal. There was a variance between the name of the party to whom the check was alleged to have been passed and the party to whom it was really passed.

3. Defendant resided in Fisher County, and never had or passed the check in Nolan County; and on that account the check was inadmissible. Code Crim. Proc., art. 206.

4. The court erred in refusing to allow proof as to the reputation for truth and veracity of a lady witness, who was a nonresident and stranger before the jury. Phillipps v. The State, 19 Texas Cr. App., 158.

5. Defendant being on trial for passing a forged instrument, it was error to allow testimony to go before the jury to show that the defendant had committed the crime of embezzlement at a different time and place, or to admit proof of embezzlement at all. Reno v. The State, 25 Texas Cr. App., 102; Barton v. The State, 28 Texas Cr. App., 483; Carter v. The State, 23 Texas Cr. App., 508; Davis v. The State, 23 Texas Cr. App., 210; Mayfield v. The State, 23 Texas Cr. App., 645.

6. If there existed in defendant's mind, at the time he perverted the check, no intent to defraud, he could not be guilty of crime.

7. If the defendant, in the use he made of the check, acted under an authority, which he had good reason to believe, and did actually believe, to be sufficient, he was not guilty, though the authority was in fact insufficient and void. Penal Code, art. 441.

*R. L. Henry*, Assistant Attorney-General, for the State.

SIMKINS, JUDGE.—Appellant was convicted of passing a forged instrument, and his punishment assessed at two years in the penitentiary, from which he appeals.

The appellant complains, that the court erred in not sustaining his motion to quash the indictment, on the ground that the indictment in one portion described the instrument as "forged," and in another portion of

said indictment charged that appellant knew the endorsement was forged. The court did not err. The name of the payee endorsed on the back of the check, payable to order, would, had it been genuine, have made the check negotiable (Burks' case, 24 Texas Criminal Appeals, 328), and, being forged, was such an alteration of the instrument as made it forgery under article 432, Penal Code. Bish. Crim. Law, 572, 573. Hence knowledge of this fact in passing the instrument was sufficient to constitute the offense of "knowingly passing as true a forged instrument." Penal Code, art. 443.

Neither did the court err in overruling the objection to the admissibility of the forged instrument, upon the ground that the same was passed in Nolan County, by one Thomas, the clerk of appellant, and not by appellant, who was in Fisher County, because the clerk was the innocent agent of appellant, and passed the check under instructions of appellant.

Appellant complains, that the court erred in the fifth and sixth paragraphs of his charge, to the effect that if appellant, acting through his agent, S. W. Thomas, did knowingly and fraudulently pass as true to R. L. McCauley the forged instrument, they should find him guilty; because said charge assumes the fact to be, that S. W. Thomas was the agent of appellant, and it was therefore a charge upon the weight of the evidence. There was no issue on the question of the agency. It was not only shown by the evidence of Thomas, but appellant stated himself, that the said Thomas was his clerk, and cashed the check under his orders; and that the name of the payee, A. Rawlins, was endorsed thereon by appellant before delivering it to Thomas. There was no error in the charge.

The appellant complains, that the court erred in permitting the witness to prove that appellant had embezzled other funds, and had confessed the fact, when charged with it, in the same conversation in which he admitted he had signed Rawlins' name, and obtained the money on the Rawlins check. The court says no objection was made to the testimony on the ground that it was a separate offense. We do not see why this testimony was not admissible as throwing light on the intent of appellant. The sole defense in this case was good faith. Appellant admitted, that without authority of Rawlins, or specific directions from Millsap, he had endorsed Rawlins' name on the check, and drawn the money, but with no fraudulent intent. He claimed that he had signed Rawlins' name in good faith, believing he had the same right to act as Millsap himself, and under Millsap's express direction "to transact his business exactly as he would have done." When confronted by the registered letter of Millsap, found opened in his private drawer, he declared he intended to deliver the letter to Millsap, but thought it was lost. To show that appellant was secreting the letter, the State proved that appellant denied collecting some money for Millsap, when in fact he had done so, and was concealing it from him, and only admitted the fact when detected in possession

of the registered letter. It is certainly reasonable to suppose, that one who acts in good faith for another will not deny and conceal from him matter that he has a right to know. The subject matter in both instances was the same — the agency of appellant. Francis v. The State, 7 Texas Cr. App., 514; Pitner v. The State, 23 Texas Cr. App., 366.

But the appellant claims, the court erred in not limiting in his charge the effect of this evidence. There was no exception taken to the charge on this account, nor instructions asked, nor was there any such ground set up in the motion for a new trial, nor on any assignment of error. It is first suggested in brief of counsel, and it is urged, that the failure of the court to limit the effect of the evidence was fundamental error, for which this court will reverse. There have been many cases to the effect that the failure of the court may be so regarded; but it is not every failure that is to be so regarded. It will be found that the principle running through the cases is, that where extraneous facts are introduced, because part of res gestæ, as in Reno's case, 25 Texas Criminal Appeals, 110; Holmes' case, 20 Texas Criminal Appeals, 509; or as a matter of inducement, as in Washington's case, 23 Texas Criminal Appeals, 336; or where the same character of crime is shown, as in Taylor's case, 22 Texas Criminal Appeals, 546, which might, if not explained or limited, exercise a wrong, undue, or improper influence upon the jury in their consideration of the main issue, it will be reversible error. Hence, the question always is, did the failure of the court to limit the evidence injure defendant? Davidson's case, 22 Texas Cr. App., 383; Brown's case, 24 Texas Cr. App., 181; Leeper's case, 29 Texas Cr. App., 69; Blackwell's case, 29 Texas Cr. App., 195; McKinney's case, 8 Texas Cr. App., 639; Blumann's case, 21 S. W. Rep., 1027; Taylor's case, 22 Texas Cr. App., 545. If there is nothing to show that the jury were improperly misled, this court will not, in the absence of requested instructions, or where there is a failure to except, reverse the case. Leeper's case, 29 Texas Cr. App., 69.

Applying the law to the facts, we may concede that appellant was the agent of Millsap, and even to the extraordinary extent claimed by him of attending to Millsap's business as if it were his own, and opening his business letters; but such authority, however great, can hardly be honestly invoked in the case at bar. Appellant was a merchant, and attended to Millsap's business, and was postmaster at Fisher. He visited Millsap in Stonewall County, bearing a letter from A. Rawlins, stating that his contract was completed, and that he owed him $85 for a tombstone. Millsap, having money at Trammell & Co.'s bank at Sweetwater, wrote a check for the amount. He then wrote a letter to A. Rawlins, enclosed the check in an envelope, and sealed, directed, and stamped it, and delivered it to appellant, to be sent by mail. Appellant received the letter. He knew that Millsap had money at Trammell's bank, but made no effort to

borrow any, but when he got home he opened the letter, endorsed A. Rawlins' name on the check, and drew the money. If the letter had contained bank bills instead of a check, it would be difficult to understand how a general agency would have authorized the opening of the letter, and the appropriation of the funds, in defiance of the direct instructions of Millsap; but certainly no such agency could be introduced as a defense for signing a name he had no pretense of authority for signing, and thereby obtaining the money. We think the evidence clearly shows that appellant not only knew he had no authority, but on the contrary, sought to conceal his act from Millsap. There was no possibility of his being convicted of embezzlement. The only issue here was forgery. Millsap sent the money to Rawlins. Appellant intercepted the money by signing Rawlins' name. The punishment assessed was the lowest, and we can not see any possible injury in the failure to limit the effect of the evidence.

The judgment is affirmed.

*Affirmed.*

HURT, P. J., and DAVIDSON, J., agree to the conclusion, but do not think the evidence admissible; but under the circumstances of this case this testimony did not injure the defendant, the proof showing beyond question that appellant had no right, from the course of dealing between the parties, nor from any other source, to such use of the draft in question, nor any reasonable ground to believe that he had a right to do so.