### Bob Stevens v. The State.

No. 2551. Decided June 27, 1900.

1. **Severance by Joint Defendants—Agreement to Turn State's Evidence.**

Affidavits for severance by one or more joint defendants to have other codefend-ants first tried, although in strict compliance with the provisions of article 707, Code of Criminal Procedure, will not entitle the affiants to such severance where it is made to appear by controverting affidavits of the said codefendants, and the district attorney that, by an agreement entered into with said defendants, they were to turn State's evidence against the other joint codefendants and receive im-munity from punishment. The article 707, and articles 37 and 630, Code of Criminal Procedure, authorizing the district attorney, with consent of the court, to permit one or more of the parties accused of a crime to turn State's evidence in order to use them as witnesses against their codefendants, must be construed together.

2. **Murder—Evidence—Threats—Acts and Declarations of Coconspirators.**

On a trial for murder, where a conspiracy is shown, the acts and declarations of coconspirators are admissible to prove the common design, purpose, and intent of all the conspirators whether such acts and declarations were before or after the formation of the conspiracy, or whether the same were made before the defendant on trial entered into the conspiracy. Where a party knowingly enters into a con-spiracy, after its formation, he is held to have adopted all the previous acts, declarations, and designs of the conspirators previously made which tend to illus-trate the common design, purpose, and intent with which they all acted.

3. **Same—Letter of Conspirator Who Has Turned State's Evidence.**

On a trial for murder, the letter of a coconspirator who has turned State's evi-dence, written from jail to his wife, is not admissible in evidence for any purpose.

4. **Same—"Malice"—Charge of Court.**

On a trial for murder, the charge of the court is substantially correct which de-fines malice as follows: "Malice aforethought is a condition of mind in which one man does an intentional injury to another in willful disregard of the rights of the other. * * * It exists when one does a cruel act voluntarily and without ex-cuse, justification, or extenuation, and does not necessarily include hatred towards the person injured. * * * Express malice exists when a murder is committed with sedate and deliberate mind and in pursuance of a previously formed design to kill the person killed." Upon this point see concurring opinion of Henderson, Judge.

5. **Same**

On a trial for murder, where, from the evidence, it appears that the crime com-mitted was a cold-blooded, deliberate murder, an erroneous definition of "malice" in the court's charge would be harmless.

6. **Same—Charge as to Lesser Degrees.**

On a trial for murder, where the evidence only raises the issues of murder in the

first degree and alibi, it is not error for the court to refuse to charge upon any phase of murder in the second degree nor manslaughter. Nor can it be understood why such charges were called for although the evidence shows the original design of the defendants, who were coconspirators, was not to commit murder, which they afterwards committed by hanging deceased.

**7. Same—Charge as to Alibi.**

On a trial for murder, where the court, as to the defense of alibi, charged the jury, "The defendant could not be guilty as charged unless he was present at the commission of the offense, if any; and, if you have a reasonable doubt of defendant being present at the killing of deceased, if any, you will acquit him," Held, a distinct, clear, and substantive charge upon the law of alibi.

**8. Jury and Jury Law—Practice.**

In trials for murder, it is the better practice that jurors should be kept together by themselves, and they should not be permitted to attend divine worship where statements might likely be made prejudicial to defendant's rights.

**9. Change of Venue.**

Where the court has changed the venue of the prosecution of his own motion, the court on appeal will not revise such action unless there is shown an obvious and clear absence of discretion under the statute.

APPEAL from the District Court of Anderson, on a change of venue from the county of Henderson. Tried below before Hon. A. D. LIPSCOMB.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The appellant was charged by the indictment, together with Joe Wilkerson, Walter Wilkerson, W. B. Brooks, Sam Hall, W. A. Johns, and John Gaddis, with the murder of Jim Humphries by hanging him with a rope to a tree, on the 23d day of May, 1899, in Henderson County.

At the same term of the court each of the above joint defendants was separately indicted in two different indictments for the murder of the other two Humphries; in one for the murder of John Humphries; in the other for the murder of George Humphries; that is to say, the defendant, Bob Stevens, was jointly indicted as set out above, with all the defendants for the murder of Jim Humphries (number 2840). He was also indicted (number 2853) in a separate indictment for the murder of George Humphries; and in another separate indictment (number 2854) for the murder of John Humphries, and so was each of the other defendants similarly indicted.

John Greenhaw, Arthur Greenhaw, and Polk Weeks are each separately indicted, three bills against each; that is to say, John Greenhaw is indicted in one bill for the murder of Jim Humphries; in another, for the murder of John Humphries, and in another for the murder of George Humphries, and so with Arthur Greenhaw and Polk Weeks.

At the September term of the District Court of Henderson County, on September 7, 1899, the court, of his own motion, changed the venue of all the defendants, except John and Arthur Greenhaw and Polk Weeks, in all of the cases, to the District Court of Anderson County, Texas, to which order of the court so changing said venue the defendants tendered their bills of exception.

On the 18th day of September, 1899, at said September term of the District Court of Henderson County, the court, on his own motion, transferred one case each pending against John Greenhaw, Arthur Greenhaw, and Polk Weeks to said District Court of Anderson County, Texas; that is the case wherein each of them is charged with the murder of George Humphries, leaving two cases each against them pending in the District Court of Henderson County for the murder of John Humphries and for the murder of Jim Humphries, respectively.

All of the joint defendants in number 4383, being number 2840 on the docket of the District Court of Henderson County, made their joint motion and affidavit for severance in all things complying with the statute, asking that the two Greenhaws and Polk Weeks be tried in advance of said codefendants, that they might have their testimony untainted at the time of its delivery either by the acquittal of said three persons, or an order of dismissal of the prosecution pending against them, to the end that each might testify without a prosecution hanging over him, which motion was overruled by the court and all the joint defendants ordered by the court to make an announcement. All the joint defendants, except the defendant, R. J. Stevens, then made their motion and affidavit to have said Stevens first put on trial in advance of them, which motion was sustained by the court and said Stevens ordered to announce. The said defendant Stevens then made his individual motion, supported by affidavit for a severance, asking that the said two Greenhaws and Weeks be first put on trial in advance of him, which individual motion was also overruled by the court and said Stevens forced to go on trial before said Greenhaws and Weeks. The grounds of objection upon which the court acted in overruling said motions for severance and in refusing to put John and Arthur Greenhaw on trial in advance of the joint defendants, or in advance of the defendant Stevens, are contained in the answer the affidavit and protest made by said Greenhaws and Weeks.

The district attorney also filed his answer and protest to said motion of said joint defendants to have said Greenhaws and Weeks first tried, which the court also considered in overruling the motion of the joint defendants. The substance of the matter stated in these protests against the severance will be found fully stated in the opinion of the court below.

As stated above, on motion of his joint codefendants, whose motion for a severance was granted, this appellant was first put on trial, which resulted in his conviction as above stated.

The Humphries, Jim, George, and John, lived in what is known as the trans-cedar country, in Henderson County. They were each taken from their homes, at between 1 and 2 o'clock p. m., May 23, 1899, and were hanged to a tree, by a mob, not very far from the places of their residence. George and John Humphries were each sons-in-law of Jim Humphries, and lived but a short distance from him. The parties com-

prising the mob which hung them stated that they were hunting for a man by the name of Patterson, who, some time prior thereto, had killed a man by the name of Rhodes (a constable), and was otherwise charged and had the reputation of being a thief and bad character. It appears that he was a fugitive, and the mob claimed that he was being concealed by the Humphries, who were also claimed to be hog thieves. Polk Weeks and John and Arthur Greenhaw turned State's evidence, and they testified that the parties constituting the mob which had hung the Humphries, after they failed to find Patterson, consisted of the following named persons, viz: Joe Wilkerson, Walter Wilkerson, W. B. Brooks, W. A. Johns, Sam Hall, John Gaddis, Mahan, Arthur Greenhaw, John Greenhaw, Polk Weeks, and the defendant in this case, Bob Stevens.

John Greenhaw, in his testimony, testifies to the immediate facts attendant upon the hanging, as follows: That after arresting each of the parties and taking them out into the road, they talked to the Humphries awhile. They, the mob, "asked them if they knew where Patterson was, and the Humphries said they didn't know. They talked there awhile and then took them out in the woods. The tree where the Humphries were hung is fifty or seventy-five yards from the road. The crowd took the Humphries out there and tried to get them to tell where Patterson was, and they didn't do it; the crowd told them if they didn't tell them they would hang them; the Humphries didn't tell, and they just naturally hung them. They tied ropes around their necks and tied it to a tree, and put the Humphries up on some horses and drove the horses out from under them. I never saw any one touch the horses only Joe Wilkerson; he hit one horse. I didn't do anything. Polk Weeks tied the ropes around the tree. I didn't see anyone tie up their feet, but heard something said about their feet touching the ground, and somebody spoke about tying them up, but I didn't see who it was. After they were dead we went home. We went right up the road north, and then turned west. I got home about 3 o'clock, maybe later than that. Arthur Greenhaw went home with me." Polk Weeks' testimony is to the same effect.

Defendant's only defense relied upon was alibi. Over his objections the State proved by Jim Sullivan that in February, 1898, he was in the town of Athens, Texas, and was there introduced to Joe Wilkerson by E. J. Rice; that in a conversation had with Wilkerson at that time Wilkerson told him that he was there at court prosecuting some persons for stealing his hogs; that if the law did not give him revenge for it,— that is, for the theft of his hogs,—he was going to take it himself; that he was talking about the deceased, the Humphries people, and said he was going to make the sons of bitches look up a limb, and that he wanted some of us fellows at Athens to help him; that no one was present but Rice, Wilkerson, and witness.

The State also introduced witness J. A. Bell, who testified substantially: That at Grady's gin, in Henderson County, in September, 1898;

he had a conversation with Wilkerson, none else being present, and Wilkerson said that the Humphries ought to be put out of the country; that they ought to be hung, and that he was going to see that they (meaning the deceased) were hung. Witness had asked Wilkerson about his case with the Humphries, and in reply he said the outfit ought to be put out and ought to be hung.

Witness Dave Claymans, introduced by the State, testified substantially: That in Henderson County, about the 1st of June, 1898, and one year prior to the lynching, he had a conversation with Joe Wilkerson in the presence of John Rhodes, the constable (now dead), and Walter Wilkerson, and, he thinks, Bill Brooks (two of the accused), and Joe Wilkerson was talking to witness about the Humphries boys stealing his hogs, and he said when he got through with them they would not steal any more; that he had them in court for stealing his hogs.

The State proved in substance, by E. H. Garrett: That on the morning of the first Saturday in April, 1899, Joe Wilkerson was speaking to witness (who was at that time justice of the peace of the trans-cedar country) about the hog-theft trial or case of the Humphries and said to witness: "That some people said that the Humphries would beat the case," and witness replied to him, "Yes, thought they would, that they virtually had it beat at that time." When Wilkerson then said, "If they did beat their cases it would cause mob law in this country." The said conversation occurring in his (witness') precinct and near Aley, and no one else was present but witness and Wilkerson.

Defendant objected to proof of these declarations of Wilkerson, because it was incompetent and irrelevant, hearsay and not binding upon defendant Stevens; that a conspiracy had not been shown at the time said acts and declarations were made on the part of anyone, and it had not been shown to exist at any time prior to the day of the homicide, and said acts and declarations, if binding at all, could only be binding against Joe Wilkerson, and besides were not made in furtherance of a common design agreed upon with anyone, and certainly not with defendant Stevens.

*E. B. Muse, J. S. Woods, Starr & Allison, Stillwell H. Russell, Gregg & Brooks,* and *Faulk & Faulk,* attorneys for appellants.

The court erred in overruling the motion for severance made by defendant and his six codefendants, supported by their affidavit, to have John and Arthur Greenhaw and Polk Weeks first put on trial, and in overruling his individual motion and affidavit to have the said Greenhaws and Weeks first put on trial, said motion and affidavits in all things complying with the law—which two said assignments will be treated as one assignment.

There is no counter or contesting affidavit or motion of any description filed by the State to the individual motion and affidavit of

defendant Stevens. Shaw v. State, 45 S. W. Rep., 597; King v. State, 34 S. W. Rep., 282; Wiley v. State, 22 Texas Crim. Rep., 408; Code Crim. Proc., arts. 630, 37, 707-710.

The threats, acts or declarations of one joint defendant ought not to be introduced as evidence against another defendant unless a conspiracy exists to which that other defendant belonged, or ratified, and such acts and declarations, to be competent, must be in furtherance of a common design.

If the court lets in the acts and declarations of a codefendant before a conspiracy, by the testimony, is established, and the testimony finally fails to show a conspiracy, it is the duty of the court to instruct the jury not to consider said acts and declarations for any purpose. Menges v. State, 25 Texas Crim. App., 711; McKenzie v. State, 25 S. W. Rep., 428; Luttrell v. State, 31 Texas Crim. Rep., 505; Crook v. State, 27 Texas Crim. App., 240; Martin v. State, 30 S. W. Rep., 222; Smith v. State, 21 Texas Crim. App., 119; Arnold v. State, 9 Texas Crim. App., 438.

When the principal issue in a murder case is, who committed the homicide, the defendant is entitled to introduce evidence tending to prove that some other person is the guilty party.

We copy from the following bill of exceptions, which gives a full statement of the case pertaining to this particular question, to wit: "Be it remembered that the following proceeding on the trial of said cause took place: The State's witness, John Greenhaw, was testifying upon cross-examination, and it was competent, under all the circumstances connected with the case, to admit the evidence. (1) Because it showed the declarations and animus on the part of Gardner to commit the crime in question. (2) It showed an association and connection at that time with the animus, purposes and declarations of John Greenhaw. (3) The evidence showed a familiarity with those made by John Greenhaw and that he had adopted the declarations and purposes of Greenhaw as his own in seeing the witness himself and making the same proposition to him. (4) It tended to show in support of defendant's theory a collusion between Greenhaw and Gardner. (5) It tended to show that at the time they were in concert and were principals in the agreement and conspiracy to mob. (6) There was nothing in the testimony to show, or that tended to show, that in the interval that Dutch Gardner was friendly with deceased or had been on friendly terms with him that would convey the idea remotely or indirectly, either that they never had such a conspiracy, or if it had existed it had been abandoned, etc., by their becoming friends. But upon the contrary it was shown that Greenhaw claimed that the Humphries had stolen his hogs all along and that the man Patterson, who Greenhaw suspected the Humphries with harboring, had threatened the life of Greenhaw on the very day that he had threatened to kill and did kill the constable Rhodes. And it was in further proof that Greenhaw and Gardner were like brothers in their friendship, and had been for years, therefore it is

a legitimate inference that Gardner shared with Greenhaw his enmity toward the Humphries. Defendant insists that these reasons are matters of inducement that tend to show that Gardner and Greenhaw were in actual concert in an agreement as between themselves to mob the Humphries and enlist the services of others, and if caught to "ramrod the crime off on others." He insists that the testimony of Thomas as to what Gardner said is competent, and that, taken in connection with the rejected letter and other evidence admitted, it tended to support the theory of the defendant that he at least was one of the victims of their plot and scheme, and was sufficiently material and relevant for the jury to hear and consider, in view of all the circumstances connected with and surrounding the confession of Greenhaw and the instrumentality and interest of Dutch Gardner in having the same made. Defendant says it is material, that is, the letter and the rejected testimony of Thomas, for the further reason it was repeatedly asserted by the State during the trial in the presence and hearing of the jury, "somebody mobbed the Humphries, and if the fellows whom we have caught did not do it, let them show us who did." Therefore in this connection, when it is considered that circumstances were relied upon to connect this defendant with the crime, the evidence tended to establish a reasonable hypothesis that others might have committed it; and the hypothesis be consistent with defendant's theory as herein advanced and inconsistent with his guilt. Whereupon the court sustaining the objections of the State to the admission of the letter and to the admission of the testimony supposed to be shown by the witness, Thomas, as to what Dutch Gardner said to him, the defendant's counsel excepted to the ruling and action of the court and tenders this bill within ten days from the overruling of defendant's motion for new trial signed by counsel and approved by the court. Dubose v. State, 10 Texas Crim. App., 230; McInturf v. State, 20 Texas Crim. App., 355; Hart v. State, 15 Texas Crim. App., 204; Kunde v. State, 22 Texas Crim. App., 67.

The court erred in his definition of express malice as given in the charge.

The court in the sixth clause of his charge uses these words, "express malice exists where a murder is committed with sedate, deliberate mind, and in pursuance of a previously formed design to kill the person killed." Crook v. State, 27 Texas Crim. App., 242; Pickens v. State, 13 Texas Crim. App., 357; Harrell v. State, 55 S. W. Rep., 824; Primus v. State, 2 Texas Crim. App., 375; Sumers v. State, 5 Texas Crim. App., 379.

The court erred in its charge in its definition of "malice aforethought."

The court in the fourth clause of his charge in defining malice aforethought uses the following language: "Malice aforethought is a condition of mind in which one man does an intentional injury to another, in willful disregard of the legal rights of the other, and is to be in-

ferred from acts committed or words spoken. It exists when one does a cruel act voluntarily and without excuse, justification or extenuation, and does not necessarily include hatred toward the person injured." Cahn v. State, 27 Texas Crim. App., 738; Hayes v. State, 14 Texas Crim. App., 331; Pickens v. State, 13 Texas Crim. App., 357; Harris v. State, 8 Texas Crim. App., 109; McKinney v. State, 8 Texas Crim. App., 627.

The court erred in refusing to give defendant's requested instruction to the effect, that the mere presence of defendant at the hanging did not make him a party thereto, and the court erred in not giving a charge upon murder in the second degree.

1. That he can be present at the crime and not be a party to it: Burrill v. State, 18 Texas, 713; Ring v. State, 42 Texas, 282; Jackson v. State, 20 Texas Crim. App., 190; Golden v. State, 18 Texas Crim. App., 637.

2. That the court should charge on every theory of the defense: Rutherford v. State, 15 Texas Crim. App., 236; McLaughlin v. State, 10 Texas Crim. App., 359; White v. State, 18 Texas Crim. App., 63; Butler v. State, 33 Texas Crim. Rep., 235; Wier v. State, 29 S. W. Rep., 1074; Red v. State, 53 S. W. Rep., 618.

After the jury was impaneled, before they returned a verdict, services were held in the district court room, at the courthouse, under the auspices of the Y. M. C. A. The jury attended by a special invitation.

The affidavit of the juror, R. M. Chandler, is as follows:

"The jury attended the Y. M. C. A. on Sunday preceding the return of the verdict. We heard there was going to be such a meeting and went; heard the sermon of Rev. Mr. Alexander, I heard we were invited to be present but I did not hear the invitation; heard all the sermon. Said there were tragedies enacted in our State and in our sister county; and went on to say what it would bring people to. I don't recollect his mentioning mob; he may, but I don't remember it. He said, people were drawn from home on account of these tragedies. I can't say whether he had reference to those attending Stevens' trial had been drawn here; said a tragedy had been enacted in our State and sister county, and that people had been drawn here. I don't remember that trans-cedar was mentioned. I recollect he said that widows and orphans were being made by these tragedies. It occurred to me that he was alluding to the widows and orphans made by the Henderson County mob, as well as all other tragedies. Preacher preached, I reckon, half an hour. He was just exhorting the people to do better; did not talk on any particular crime. The sheriff told us we could be present and heard Mr. Alexander. He never mentioned jury; never turned around towards us. On Friday evening before Saturday of the return of the verdict, the sheriff said he had orders to prepare a boarding place for us in Athens for twenty days. Yes, I understood that it would be after this court adjourned. We never discussed how we stood before

the argument of counsel was heard. After the case was submitted we first stood six for acquittal, on the second ballot we stood seven for acquittal. That was the same night the case was given to us. I can't say whether it was Thursday or Friday when the sheriff said he had been ordered to have board prepared for us for twenty days in Athens. Brought in verdict 11:30 or 11:40 Saturday.

"The sheriff just laughed when he spoke of the twenty days board, and said he took it back, that it was a joke. The remarks of Rev. Mr. Alexander had no weight at all with me. We did not refer to it in making our verdict. The case of Stevens was not referred to by him at all. (Re-direct.) I said this morning, in talking to defendant's counsel, that the statement, in the motion for new trial, in reference to the statements made by Rev. Alexander were substantially correct, except that he did not refer to or address the jury, and that he did not say anything about mobs. He said that men that engaged in such tragedies would be punished after death. My mind, of course, was on the case before then, and at that time. His speaking of tragedies made my mind revert to it. Mr. Alexander talked loud and earnest. The officer was present that had us in charge. I thought he was including this mob, as well as other mobs. (By the court.) Yes, the sheriff was instructed by the court not to permit anyone to talk to us, or in our presence. I was kept very close."

The affidavit of the juror, J. T. Walker, is as follows: "On Sunday, before the case submitted on Wednesday, at Y. M. C. A. preacher said courthouse had been used all week for trial of causes; said used to-day for the purpose of worshipping God; said a great tragedy had been committed in our sister county, or something to that effect; said great many strangers present; said all ought to try to do better, and call on all that would do better to hold up their hands. He said that a crime had been committed; said what caused crimes; said sin was the cause; said he hoped the strangers would go home and try to do better and erect a family altar. I did not pay much attention; don't recollect that he said anything about orphan children.

"I thought Rev. Alexander referred to the crime for which defendant was on trial, among other crimes. The secretary of the Y. M. C. A. met sheriff and asked him if he could bring jury to Y. M. C. A.; said would reserve the jury seats for them. Sheriff said he would bring, and did bring us to the meeting. Sheriff one time started to lock us up; said the judge told him about the 20th to make arrangement for board for the jury at Athens. If the sheriff corrected that, I did not hear him. Alexander commenced talking about 4 and we got out at about 5 p. m. I never thought about reporting the matter to the judge.

"I was sick day of the lecture; it had no influence on me. I don't know whether Alexander intended his lecture to influence us or not."

The affidavit of S. J. Bryan, secretary of Y. M. C. A., is as follows:

"I invited the sheriff to have the jury present * * * I invited him on Friday night. Alexander referred to crime and said it was the consequences of sin. I don't remember his saying anything about strangers; never held meeting of this kind before in courthouse. I can't state substantially anything he said. One text was that the 'Wages of Sin Is Death;' he did not use the word tragedy. Some one said when we were going out at the door that Alexander did not know the jury was present. He did not mention mob; preached a spiritual sermon on sin and its effects. The preacher did not know the jury was present; did not refer to the case on trial in any shape or form. I can't recollect all he said, but he did not refer to the lynching cases."

The affidavit of I. Alexander is as follows:

"Now comes I. Alexander, who, being duly sworn, testifies as follows: "I. Alexander says that he is the minister who preached, or lectured, in the courthouse Sunday, December 31, 1899; that he did not know the jury in the Bob Stevens case were present in said courthouse. That he did not preach, or lecture, concerning the Stevens case, the Henderson County mob, or any other mob. That he did not say that a great crime had been committed in a sister county, nor that the guilty party should be punished; nor did he say that mobs were caused by sin; nor that if the people were free from sin there would be no more mobs and mob violence; nor did he say that those who were guilty ought to be brought to justice; nor did he say that the widows and orphans from Henderson County were made so by the red hand of mob law; nor did he know of any arrangement for the jury to be present at said service. Affiant further says that he made no reference at all to mobs, mob violence, or manhood in the jury box, or the suppression of sin by the enforcement of the laws; nor did he say anything of that character; nor was anything said, directly or indirectly, about the trial of Bob Stevens or of any other trials. And he had no intention of having any influence on said jury.

"I. ALEXANDER.

"Sworn to and subscribed before me, this the 13th day of January, 1900.

"GEO. SCARBOROUGH, D. C.

"That each of the aforesaid last six named men, who were a part of the jury in the Bob Stevens case, testifies, each for himself, that he was present on the date mentioned and heard Dr. Alexander's lecture, and that said lecture had no influence whatever upon his verdict. And the said Dr. Alexander did not mention mob violence or mob law; made no reference to the trial of Stevens or any other person connected with the Henderson County cases, and said nothing whatever about manhood in the jury box, nor did he say anything about the enforcement of the law to suppress sin, nor did he say anything calculated to influence us

in our verdict. The other six jurors are absent. The sermon, or lecture, was not mentioned by anyone of the jurors in the box.

(Signed)                     "G. W. COFFEY,

                           "R. M. CHANDLER,

                           "TOM WALKER,

                           "W. L. EAGLE,

                           "J. S. YATES,

                       "HARDIN PERKINS.

"Sworn to and subscribed before me, this the 13th day of January, 1900.                        GEO. SCARBOROUGH, D. C."

"Now comes the State of Texas, by her district attorney, and denies all and singular the allegations of fact in said defendant's motion for new trial, filed herein, and demands strict proof of same.

"Affidavit of minister and six jurors attached and made a part hereof.

                                 "J. M. CROOK,

                   "District Attorney Third District."

Code Crim. Proc., art. 728 and art. 817, subdiv. 7; Mitchell v. State, 36 S. W. Rep., 457; Defriend v. State, 22 Texas Crim. App., 570; Kelley v. State, 28 Texas Crim. App., 121; Burris v. State, 40 S. W. Rep., 285; Darter v. State, 44 S. W. Rep., 851.

The court erred in failing to give a charge on alibi and in refusing to give defendant's requested instruction on that subject.

His alibi was the only defense relied on by defendant, the evidence as to identity arising only incidentally to the alibi and in rebuttal to State's evidence. Ayres v. State, 21 Texas Crim. App., 399; Oxford v. State, 32 Texas Crim. Rep., 272; Rider v. State, 26 Texas Crim. App., 334; Davis v. State, 14 Texas Crim. App., 645; Anderson v. State, 34 Texas Crim. Rep., 546.

*N. B. Morris* and *Rob't A. John,* Assistant Attorney-General, for the State.

The prosecution against appellant's codefendant for the killing of Jim Humphries not pending in the court of Anderson County, and the change of venue of the cases against appellant being regular and according to the statute, no abuse of the discretion lodged in the judge for changing the venue being shown (Nite v. State, 41 Texas Crim. Rep., 340; Cannon v. State, 41 Texas Crim. Rep., 467), and the record showing that the companion cases against codefendants at the time appellant was arraigned and the case against him called for trial was in another and different form, the granting of the severance and the forcing of appellant's codefendants to trial first, would of necessity have caused a continuance. This is in specific contravention of article 708, which asserts that the right of appellant to the remedies guaranteed

by this article, are absolutely conditional upon the contingency that the exercise of that right will not cause a continuance. It is no answer to this contention, that the change of venue was made over appellant's protest,—the protest being based upon the proposition, among others,—that it has separated appellant's forum from that of the codefendants, and therefore defeated his right of severance under said article 708, because appellant made no such insistance in the original forum, and no effort to obtain a severance was presented in that forum, but appellant delayed his motion until, under the terms of the statute, he was not entitled to the same; and by his own laches in not making the motion for severance until after the change of venue as above, his rights are lost. See arts. 707, 708, Code Crim. Proc.

It is submitted by the State that articles 707 and 708 are to be construed together, and the right of a severance and order of trial is a right guaranteed appellant only when the order of trial is agreed upon among themselves, or at least where the record is silent as to any dispute or protest made by the codefendants, the trial of which appellant seeks to advance. The State submits that article 708, which says, when the codefendant whose case is sought to be advanced, protests or disputes appellant's right to have him tried first, that then the matter is lodged within the discretion of the court whose duty it is to determine the order of trial. Appellant contends that the right of codefendant is based solely upon the ground, and exists only when the codefendant will make the oath indicated by article 707, which would cause the protesting codefendant, in order to prevent appellant from forcing him into trial first, to swear that appellant was innocent, or at least that there was not sufficient evidence to encompass his conviction. The codefendant not being able to make that oath, because it is not truth, would in that event be robbed of his privilege of having appellant tried first, although it might be clearly shown and might be apparent to the court that the oath appellant made, complying with article 707, was absolutely false. Courts of justice would in such event, if the construction urged is correct, be forced by the terms of the law, to reward perjury and punish those whose fidelity to the truth prevents them, although solemnly protesting, from having appellant tried first. The State submits that the dispute between the codefendants, under article 708, which should be construed with article 707, absolutely defeats appellant's right to have as a matter of arbitrary right his codefendant tried first. This the State insists has been specifically decided. Arts. 707, 708, Code Crim. Proc.; Parker v. State, 33 Texas Crim. Rep., 111; Chumley v. State, 32 Texas Crim. Rep., 255; Shaw v. State, 39 Texas Crim. Rep., 161.

The court properly excluded the letter written by John Greenhaw, while he was in jail, to his wife. There is absolutely no evidence connecting Dutch Gardner with the homicide, except a vague and remote theory of appellant. The threats, which the witness testified occurred over three years before the homicide, and the evidence is too remote to

become admissible. As to the correctness of the ruling of the court in admitting the acts and declarations of Joe Wilkerson, defendant's co-defendant:

That is a well settled rule of law that the declaration of a coconspirator in the absence of the defendant on trial is admissible against that defendant, if made in pursuance of the common design, and that it is immaterial at what time the codefendant entered the conspiracy. That the philosophy of the rule is, that a design having been established to commit the crime in issue, those who subsequent to the formation of the design and who know its scope and perhaps enter into and become parties to this criminal copartnership adopt and make their own the acts and declarations of their partner, although it occurred in their absence and anterior to their connection with the same. And while there is no case exactly in point, still it being unquestioned that where two or more have formed a design, the person who subsequent to its formation agrees to become a party to the same, is chargeable with all that was said or done anterior to his connection, and the logic of this rule is, that this should apply, even though the act introduced in evidence or the word declared was said or done by an individual who at that time was alone and who had only in his head the design which afterwards was entered into by others with him to commit the contemplated crime after it was consummated.

The evidence was unquestionably admitted, and was properly restricted by the court to show the animus of appellant's codefendant, Wilkerson, one of the issues of the trial being, what was the purpose, the scope and the extent of the conspiracy that the very corpus of the crime involved in this case demonstrates. In other words, the fact that the conspiracy was formed by several parties to hang the Humphries goes without dispute. Now then, evidence of acts done and words said by Joe Wilkerson, who is shown to be the leading spirit in the conspiracy, its originator and prime mover, are evidence which will go to show the character, purposes and extent of the conspiracy, which the State in the case at bar contends that appellant was a participant and an actor in. Now then, if appellant so acted as the State contends with the said Joe Wilkerson, knowing his design, the State is certainly entitled to the act of Joe Wilkerson, even though made previous to any agreement in order to show the character of the conspiracy, the nature, purpose and the scope of the same. Evidence to show Wilkerson's intent and by showing that appellant was acting with him with knowledge of Wilkerson's intent showed that he adopted the same. This is the law in this State by the statute of principals, those who act together. Rex v. Hardy, 24 St. Trials, 458; Cline v. State, 33 Texas Crim. Rep., 482; Armstrong v. State, 33 Texas Crim. Rep., 421; Harris v. State, 31 Texas Crim. Rep., 411; Smith v. State, 21 Texas Crim. App., 102; Blaine v. State, 33 Texas Crim. Rep., 247; Cline v. State, 34 Texas Crim. Rep., 347; Kennedy v. State, 19 Texas Crim. App., 818.

The State submits that the charge of the court in reference to the

declaration of the coconspirator Wilkerson, Johns, and others, properly and with emphasis limited the admission of these declarations to the purposes above indicated; and the State plants itself upon the court's charge as a fair presentation of the law involved, and insists that it presents the rule more favorable to defendant than the law itself authorizes.

In a discussion of the charge of the court, the rule that the same is to be construed as a whole is invoked, together with the further rule equally certain that a judge is authorized to assume in his charge the existence of facts about which there is absolutely no dispute, as a test which applies to everything in this case. Holliday v. State, 35 Texas Crim. Rep., 133; Hudson v. State, 36 S. W. Rep., 442; O'Connell v. State, 18 Texas, 363.

If it be conceded that the position of the State is correct, that the trial court has a right to assume the existence of undisputed facts in evidence, then the State submits that the fact that whosoever on the night of the 23d of May, 1899, armed with revolvers, winchesters, and shotguns, and at the dead hour of night invaded the home of the deceased, and without authority or the cover of authority took possession and searched his premises, over his protest, and that subsequently with force of arms dragged him out of his home, which in law is deemed his castle, and finally inflicted upon him the most ignominious death known to mankind,—that the actors in this tragedy are guilty of murder upon express malice,—whether the original design was merely to force him to disclose the whereabouts of one Patterson, or whether the original design was the murder of this man, is immaterial. In either event, those who committed this crime were guilty of murder in the first degree. Mitchell v. State, 36 Texas Crim. Rep., 279.

If this be correct, then certainly article 723, which asserts that the charge of the court, although erroneous, will be ground for reversal unless the same was calculated to injure the rights of the defendant. The State submits that the phrase "calculated to injure the rights of the defendant" means an error conceded, was such an error that in all probability contributed to appellant's conviction. Now, then, the State insists that, even conceding for argument that the definition of the trial court of malice and of express malice were erroneous, the fact that the murder was committed by some one upon express malice being undisputed, this error could not have contributed to appellant's injury. White's Code Crim. Proc., art. 723, and authorities therein cited.

⸱ The State, however, contends that the definition of express malice, of malice aforethought, and of murder, all considered together, gives a proper definition of these terms. The definition of express malice is substantially the same as approved in Crook's case, cited in appellant's brief. Crook v. State, 27 Texas Crim. App., 242; Martinez v. State, 30 Texas Crim. App., 129. The definition clearly defines malice to be the intentional doing of a wrongful act, without legal justification or excuse; the definition of murder being statutory; and the definition

of express malice referring to the murder, supplies the idea of an unlawful killing, calmly and deliberately committed, upon formed design, which is upheld in the Crook case, supra.

As to the charge upon accomplice, the charge does specifically and emphatically inform the jury that the corroboration must be other than the corroboration of an accomplice or accomplices,—it in effect tells the jury with emphasis, and tells them so they could not be misled or could not misunderstand the proposition, that the evidence of one accomplice could not corroborate another. The charge presents this phase with more emphasis than was presented in the Stevens case, which was upheld by this court. Stevens v. State, Dallas term, 1900.

The charge upon alibi in the Stevens case is sufficient. True, the charge does not philosophize technically upon the defense of alibi, but in plain and unmistakable terms it presents the issue and presents it in almost the exact language heretofore approved by the court. The doctrine of alibi is after all but the doctrine of reasonable doubt, and all that can be required of the charge is to specially call the attention of the jury to the reasonable doubt as it pertinently applies to the alibi insisted upon by defendant; and when he tells the jury that they must find his presence at the time and place of the homicide beyond the reasonable doubt, and in the event they doubt whether he was present, they should acquit, is the approved and favored method to concisely present to the jury the defense of alibi. Caldwell v. State, 28 Texas Crim. App., 567.

BROOKS, JUDGE.—The grand jury of Henderson County returned an indictment against Joe Wilkerson, W. Wilkerson, W. B. Brooks, Sam Hall, W. A. Johns, Bob Stevens (appellant), and John Gaddis, charging that they "did on or about the 23d of May, 1899, in said county, unlawfully and with malice aforethought, kill and murder Jim Humphries, by then and there hanging him with a rope to a tree." At the same term of the court each of the above parties was separately indicted in two different indictments, for the murder of John and George Humphries. John and Arthur Greenhaw and Polk Weeks were separately indicted in three several bills, each charged with the murder of John, Jim, and George Humphries. At the September term of the District Court of Henderson County the court, of its own motion, changed the venue of the defendants, except John and Arthur Greenhaw and Polk Weeks, in all the cases, to the District Court of Anderson County. John and Arthur Greenhaw and Polk Weeks, under the contract with the State, through the district attorney, turned State's evidence; and, in changing the venue of the various murder indictments above mentioned, the court merely transferred an indictment against each of said last named parties to Anderson County, wherein they were charged respectively with the murder of George Humphries, leaving the indictments for the murder of John and Jim Humphries, respectively, still pending in the District Court of Henderson County. Appellant

was tried in Anderson County, after the venue was changed, was found guilty of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life.

Appellant's first assignment of error complains that the court erred in overruling the motion for severance between defendant and his codefendants, supported by their affidavits, to have the two Greenhaws and Weeks first put on trial, and in overruling his individual motion and affidavit to have the said Greenhaws and Weeks first put on trial. Article 707, Code of Criminal Procedure, provides: "Where two or more defendants are prosecuted for an offense growing out of the same transaction, by separate indictments, either defendant may file his affidavit in writing that one or more parties are indicted for an offense growing out of the same transaction for which he is indicted, and that the evidence of such party or parties is material for the defense of the affiant, and that the affiant verily believes that there is not sufficient evidence against the party or parties whose evidence is desired to secure his or their conviction, such party or parties for whose evidence said affidavit is made shall first be tried; and in the event that two or more defendants make such affidavit, and can not agree as to their order of trial, then the presiding judge shall direct the order in which the defendants shall be tried; provided, that the making of such affidavit does not, without other sufficient cause, operate as a continuance to either party." Each of the several motions of appellant complies in all respects with the conditions and provisions of this article. Upon the filing of the motion (which is not necessary to be quoted) the said two Greenhaws and Weeks filed an affidavit, and denied the facts stated in the affidavits of the said joint defendants, to the effect (1) that the testimony of them, or either of them, would be at all material to the other defendants, or either of them; (2) that they, and each of them, were members of the mob that murdered Jim, John, and George Humphries, and that each of the parties to said motion was also a member of said mob, and assisted in murdering the said Humphries; (3) that each of them had heretofore testified to the effect that said parties filing said motion, together with these defendants, murdered the said three Humphries, by hanging them with ropes, about the time charged in the indictment; (4) that affiants had a contract with the State, through her proper officers, if they would truthfully testify, stating the facts concerning said murder, whenever called upon, that they shall be discharged after all of said defendants shall have been tried, or their cases otherwise finally disposed of; that said contract was made in good faith; that they have decided to keep the same faithfully, and testify in each and every trial against all other persons indicted as principals or accomplices to said murder, and ask that the other defendants be put on trial first. In addition to the answer of the three State's witnesses, the district attorney also filed his answer and protest to the motion of said joint defendants, and, among other things, states: "(1) That said case called for trial is upon indict-

ment charging the defendants in said motion with the murder of Jim Humphries. That there is no case pending in the District Court of Anderson County against the two Greenhaws and Weeks, charging said murder. (2) That the facts stated in said motion to the effect that the two Greenhaws and Weeks would be material witnesses for defendant, if they should first be tried and acquitted, are not true, and defendants knew they were not true when they subscribed and swore to said affidavit. (3) The State further says that defendants in said motion stand charged in three several indictments now pending in this court for the murder of Jim, John, and George Humphries, respectively, and that it is not true, as stated in said motion, that said murders constitute one and the same offense, in law, but, on the other hand, they are three separate murders. (4) That the State has a contract, as stated in the affidavits of the two Greenhaws and Weeks, under the terms and conditions of which the parties agreed to turn State's evidence and testify, and under the conditions of which they are to be subsequently released on the final discharge of the other defendants." There is nothing in the answer of the two Greenhaws and Weeks and the district attorney that is a legal defense to the application for severance made by appellants, except the fourth subdivision, alleging a contract with the State, through the proper officers, under the terms and conditions of which the Greenhaws and Weeks are to be released from any further prosecution provided they shall truthfuly testify concerning all the facts pertaining to said murders. They further state that up to the time of the finding of the affidavits they had complied with their part of the contract, and stand ready to testify; that they had theretofore testified in the examining trials, accusing in each instance all of the defendants of guilty participation in the murder of the three Humphries. This, we take it, is a complete answer to the application of the other defendants and appellant, asking for a severance. The proposition, stripped of all verbiage, is this: A. and B. jointly kill C. A. agrees with the district attorney to testify truthfully against B. as to the homicide, and is to be released from prosecution if he will tell the truth, the whole truth, and nothing but the truth. We held in Greenhaw's case, 41 Texas Criminal Reports, 278, that this would be a continuous contract between the district attorney, representing the State, on one side, and the party turning State's evidence on the other; and, under the terms and conditions of said contract Greenhaw is entitled to perfect immunity as long as he complies, or stands ready to comply, with the spirit and letter of the contract. This being true, B., by filing an affidavit under the terms and conditions of article 707, Code of Criminal Procedure, can not force the trial of A. first, because A. is free from any prosecution, under the contract to turn State's evidence. To hold otherwise would be to say that B., by filing an affidavit under article 707, thereby could force an abrogation of the contract on the part of the State, and A., who had previously turned State's evidence. We hold, therefore, that when appellant moved the court, under article

707, for a severance and asked that the two Greenhaws and Weeks be first tried, this should not be done, although they strictly complied with said article, in view of the answers set up by them and the district attorney, wherein a contract is shown between the district attorney and said two Greenhaws and Weeks whereby they agree to turn State's evidence and receive immunity from prosecution. It is recognized practice in this State that the district attorney may, with consent of court, permit one or more parties accused of crime to turn State's evidence and use them as witnesses against his codefendants. See arts. 37, 630, Code Crim. Proc.; Nicks v. State, 40 Texas Crim. Rep., 1; Greenhaw's case, supra. Therefore, article 707, authorizing appellant to have a severance, does not abrogate these last cited articles, nor authorize one defendant to have a codefendant tried first, when such codefendant has entered into a contract to turn State's evidence. These statutes must be construed together, and when so considered no other conclusion can be reached than that indicated above. We do not think that the court erred in refusing to grant appellant the right of severance. This being true, it matters not whether the indictments against the State's evidence witnesses remained in the District Court of Henderson County, or the venue thereof was changed to Anderson County.

Appellant's second assignment of error is that the court erred in permitting threats, acts, and declarations of one joint defendant to be introduced as evidence against another defendant before a conspiracy had been established by the testimony, and the testimony failed finally to show the conspiracy. It appears from the bill that the court permitted several witnesses to testify to the acts, threats, and declarations of Joe Wilkerson, one of the coconspirators and codefendants with appellant, made about a year prior to the consummation of the conspiracy. Appellant insists that the proof does not show that appellant was present or knew of such threats, acts, and declarations, and not being present, he was not bound thereby. The State also proved by Jim Sullivan that in February, 1898 (the killing occurred in May, 1899), Joe Wilkerson (appellant's codefendant) stated that he was prosecuting the Humphries for stealing his hogs, and that "he was going to make the sons of bitches look up a limb." The State proved by J. A. Bell that in September, 1898, he had a conversation with said Wilkerson, in which Wilkerson stated that the Humphries ought to be put out of the country; that they ought to be hanged; that he was going to see that they (meaning deceased) were hanged. The State also proved a similar statement by Dave Claymans, made by said Wilkerson about June 1, 1898. In addition to the objection that appellant was not present, he objected to all of said declarations on the further grounds that said acts, threats, and declarations, if binding at all, could only be binding against Joe Wilkerson; and, besides, they were not made in furtherance of a common design agreed upon with anyone, and certainly not with the defendant Stevens. In Harris v. State, 31 Texas Criminal

Reports, 415, in passing upon a question of this character, we said: "The court charged substantially that, where a conspiracy was entered into between two or more, the acts and declarations of each in regard to the common purpose are the acts and declarations of all; and, when one enters into a conspiracy already formed, every act done by the others before his entry or afterwards, in pursuance of the common design, and until its consummation, is the act of the one so entering. If the jury believes beyond a reasonable doubt that Harris and others formed a common purpose to kill deceased, and defendant entered into the conspiracy at any time before the death of Shields, the acts and declarations of the coconspirators made and done in pursuance of the common design after said agreement was entered into by Harris and others, and before the killing of Shields, were admissible against defendant. If defendant did not enter into such conspiracy, they should disregard such testimony in passing on defendant's guilt." It will be observed that this charge was approved, and we think it presents the law applicable to this character of testimony. See also Smith v. State, 21 Texas Crim. App., 107; Casner v. State, ante, p. 118. The trial court charged the jury as to this matter as follows: "In this trial testimony of witnesses has been admitted as to the acts and declarations of persons charged in connection with defendant with the commission of the alleged offense. If you believe such testimony to be true, yet you are not to consider it, except for the purpose to determine the character of the offense of the persons making such declarations or doing such acts, if any, and not in any case unless you believe from the other evidence, beyond a reasonable doubt, that defendant was associated in the commission of said offense, if any, with such persons whose acts and declarations were testified to, and that defendant knew of and adopted the designs, if any, indicated by such declarations, before the commission of the offense, if any." This was a very proper and apt limitation to place upon this character of testimony. If two or more parties form a conspiracy to do a certain act, and a third party enters into such conspiracy after the formation of the same, the acts and declarations of the conconspirators made before such party comes into the conspiracy are clearly admissible against the third party, where he adopts the conspiracy, common design, and purpose of all. If he does not so adopt them, then they are not admissible against him, because they do not serve to illustrate or make manifest the common purpose, design, and intent that actuated appellant at the time of the commission of the offense. The learned trial judge very properly limited this character of evidence to the purpose for which it was legitimately admissible, and warned the jury not to consider it for any other purpose. See Kennedy v. State, 19 Texas Crim. App., 618; Luttrell v. State, 31 Texas Crim. Rep., 493; Blain v. State, 33 Texas Crim. Rep., 247; Cline v. State, 33 Texas Crim. Rep., 482; Armstrong v. State, Id., 417; Cline v. State, 34 Texas Crim. Rep., 347; Isaacs v. State, 36 Texas Crim. Rep., 505.

We think the testimony established the fact that appellant was a co-conspirator in the triple murder of the Humphries, and being such, whether he entered at the beginning of the conspiracy or subsequently, the acts and declarations of Joe Wilkerson would be admissible, as illustrating the common design, purpose, and intent with which they all acted, and would be whether the acts and delarations of Joe Wilkerson were made before or after the formation of the conspiracy.

Appellant complains that the court erred in refusing to permit the introduction of a letter written by J. T. Greenhaw to his wife, as follows:

"June 21, 99, Well Hattie I want you to come over here tomorrow 22 i am at Corsicana jail and you can come and stay with me some now you can get in with me now and stay awhile and talk any time you want to i want to see you bad come at once but done you say anything about it dutch is here with me he will hand it to you he has stayed with me like a brother we are allrite Hattie don't be uneasy dont say anything

"J. T. Greenhaw

"dont say anything about this."

The objection to the introduction of this letter on the part of appellant seems to have been to show the extent of relationship existing between witness Greenhaw and one Dutch Gardner; that it was the theory of appellant that Dutch Gardner and Greenhaw had formed a plot and plan to exculpate Gardner from connection with the crime; and that to inculpate himself and turn State's evidence was a part of the plot and plan, inasmuch as witness' connection with the same had become known. We do not think said testimony is admissible for any purpose, and the court did not err in so ruling. Nor is said testimony admissible as going to show that probably Dutch Gardner was one of the coconspirators in the killing, or that he was one of the principal parties engaged in the killing.

Appellant's third assignment of error is that the court erred in his charge in defining "malice." The charge given by the court is as follows: "Malice aforethought is a condition of mind in which one man does an intentional injury to another in the willful disregard of the legal rights of the other, and it is to be inferred from acts committed or words spoken. It exists when one does a cruel act voluntarily and without excuse, justification, or extenuation, and does not necessarily include hatred towards the person injured. * * * Express malice exists when a murder is committed with sedate, deliberate mind, and in pursuance of a previously formed design to kill the person killed." The usual definition (and we specially commend the same, because it has been frequently approved by this court) is as follows: "Malice is a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is in-

ferred from acts committed or words spoken." We think the definition given in the court's charge substantially agrees with the definition just quoted. But concede that the charge of the court on malice, as contended by appellant, is erroneous; yet we think the same is harmless, in view of the record before us. The only issuable facts in the case were these: The nonpresence of appellant, or his guilty participation in a cold-blooded and deliberate murder. This being the case, if the charge should be erroneous in the definition of "malice," it could not injure the rights of appellant, because no other issue for the State is submitted, except murder in the first degree, as disclosed by the evidence before us.

Appellant, in his lengthy brief, and also in his bills of exception, complains of the failure of the court to give divers and sundry charges requested by him. We have examined all of said charges, and have thoroughly read and examined the charge of the court, and do not think the court erred in refusing to give any of said charges, nor in refusing to charge upon any phase of murder in the second degree or manslaughter. The evidence raises but two issues, to wit, murder in the first degree and alibi. If appellant was present at the scene of the himicide, aiding and abetting in the commission of the murder charged in the indictment, we are at a loss to see how, under any phase of the evidence in this case, he could have been guilty of any less grade of murder than the first degree. It may be conceded, as strenuously insisted by appellant, that the original design of the conspirators was not to murder the Humphries; yet, if the testimony of the State's witnesses (which we think is reasonably well corroborated) is to be believed, they subsequently formed the diabolical purpose of hanging the three Humphries to the same tree, and did so. Then why, how, or in what way the previous intent and purpose of the conspirators could be used as a predicate for a charge on murder in the second degree, we are at a loss to understand. If A. and B. agree to take C. out for the purpose of making him disclose where D. is, while this is unlawful, it is not murder, as contended by appellant. But suppose, after getting C. out, they agree to hang him, and proceed to accomplish that purpose by providing themselves with ropes, and do hang C.; does the previous purpose in taking C. out have anything to do in lessening the guilt of the act they subsequently perform? Certainly not. Hence the court did not err in refusing to charge on any phase of murder in the second degree or manslaughter.

Appellant complains that the court did not charge on the law of alibi. It is true, as contended by appellant, there is not as full a charge on this subject in the court's charge as might have been framed. The trial court does not state, in the usual form, that appellant "relies in this case upon the defense of alibi, which means that he was not present at that particular time and place, and, therefore, if you find he was

not present, find him not guilty," etc. But the trial court has seen fit to embrace the same idea in the following language, to wit: "The defendant could not be guilty as charged unless he was present at the commission of the offense, if any; and if you have a reasonable doubt of the defendant being present at the killing of said Jim Humphries, if any, then you will acquit him." This is a distinct, clear, and substantive charge upon the law of alibi, disconnected from and independent of any other part of the charge, and, we think, clearly presents the law of alibi to the jury. We therefore do not agree with appellant that his defense was not charged by the court.

In bill number 2 appellant complains that the jury were permitted to listen to a sermon, and that the minister during the discourse made allusion to the trial of appellant, and the crime with which he stood charged. Various affidavits pro and con are filed in reference to this matter, and, from an inspection of the same, we can not say that there is any error such as was calculated to injure the rights of appellant. By affidavit the minister denies in toto the contention of appellant that allusion was made to the crime with which appellant is charged, and other affidavits support his. We would, however, add that in the course of trials of this magnitude it is much better that jurors should be kept together, and not permitted to attend services where statements are likely to be made prejudicial to the rights of defendant.

Appellant also complains that the court erred in changing the venue from Henderson to Anderson County, and also erred in refusing to recommit said case to Henderson County. In this we do not think there was error. The court having transferred the cause upon his own motion, unless there is an obvious and clear abuse of his discretion, under the statute, we will not review his action in changing the venue. For a full discussion of this question, see Nite v. State, 41 Texas Criminal Reports, 340.

The only remaining question for our consideration is the sufficiency of the corroboration. The testimony of the two accomplices makes a clear case against appellant. Their statement is that appellant, together with the accomplices and several others indicated above, formed a conspiracy to take the three Humphries out and make them divulge the whereabouts of one Patterson. Subsequently, however, they took the Humphries to a tree near their homes, fastened ropes around their necks, and hanged them until dead, in the cruelest and rudest manner. The testimony of said accomplices is corroborated by evidence clearly tending to connect appellant with the commission of the offense, and, without reviewing the corroboration in detail, as the record before us is very voluminous, we must say there is sufficient corroboration to comply with the law. Such being the case, and no error appearing in the record requiring a reversal, the judgment is in all things affirmed.

*Affirmed.*

HENDERSON, JUDGE.—I agree to the result reached. While the definition given by the court of "malice" is subject to some criticism, I believe an analysis of the same shows it embodies a substantial definition. Ordinarily defined, "malice is the intentional doing of a wrongful act without just cause or excuse, and denotes a heart totally devoid of social duty and fatally bent on mischief." From the definition given by the court, we gather that malice is the intentional doing of an act injurious to another, in willful disregard of the rights of that other, and exists where one does a cruel act to another without legal excuse, justification, or extenuation. This embraces the essential elements as suggested in some of the definitions given. "Malice" and "malice aforethought" are treated by some of the authors as convertible terms, meaning in effect the same thing, though Mr. Bishop says "malice aforethought" is applicable alone to murder, and has an intenser signification than mere "malice." The definition of "express malice" in the charge is as follows: "Where murder is committed with a sedate and deliberate mind, and in pursuance of a previously formed design, it is murder upon express malice." Here the word "unlawful" is omitted, and the word "murder" is used. By going back in the court's charge to a previous definition of murder, it will be found that it is stated to be an unlawful killing, etc.; and so; by bringing this definition forward, we make out the definition of a killing upon express malice. It is a matter of regret, in as important a case as this, and especially where malice is so well defined in the authorities, that we should be under the necessity of construing the charge in order to determine whether or not the substantial elements of malice were given and defined by the court. It is believed, however, that the charge is sufficient. Harris v. State, 8 Texas Crim. App., 9; Martinez v. State, 30 Texas Crim. App., 129; Crook v. State, 27 Texas Crim. App., 198; Harrell v. State, 39 Texas Crim. Rep., 204.

[NOTE.—Appellant's motion for rehearing was overruled without a written opinion.—Reporter.]