## ADRA E. HAMBLIN v. THE STATE.

### No. 1670. Decided June 23, 1899.

**1. Murder in the Second Degree—Evidence Sufficient.**

See opinion of a majority of the court for facts stated which are held amply sufficient to support a verdict and judgment for murder in the second degree.

**2. Bill of Exceptions to Admitted Evidence.**

A bill of exceptions to the admission of evidence which simply states, as the objection to its admission, that it is "immaterial and irrelevant," is not sufficient. A bill of exceptions must disclose some reason why the testimony was not admissible.

**3. Murder—Evidence as to Death of a Third Party—Motive.**

On a trial for the murder of a woman, proof of the death of deceased's baby, a short time previous, and the circumstances connected with its death, which had caused defendant to be accused of killing it, were properly admitted in evidence as going to establish a probable motive for defendant's killing deceased.

**4. Same—Evidence Tending to Show Animus of Defendant Towards Deceased.**

On the trial of one woman for the murder of another, it is competent to prove by a witness that he was passing the house where the parties, these two women alone, resided, and saw defendant and another woman he did not know, but whose description suited deceased, talking together on the gallery; the unknown woman went into the house and defendant walked around on the outside to where there was a large box, where witness heard her say: "Oh, now I have found your hiding place." Held, the testimony, though remote, was admissible as going to show the feeling that defendant had towards deceased, and it indicated that deceased had been doing something that defendant did not like or approve of.

**5. Requested Instructions—Circumstantial Evidence.**

Where the court's charge covered the law of circumstantial evidence fully, it was not error to refuse a special requested instruction to the effect that there should be proof "pertinently identifying defendant with the crime beyond a mere probability or strong suspicion."

**6. Cross-Examination of a Defendant Witness—Limiting and Restricting in the Charge.**

Where matter is elicited on cross-examination of defendant, as a witness, which may be irrelevant, but which in no manner tends to criminate the defendant, the court is not required, in the charge, to limit and restrict such testimony.

**7. Same.**

When a defendant becomes a witness in his own behalf, he thereby becomes subject to the same rules of cross-examination as any other witness. HENDERSON, Judge, dissenting.

APPEAL from the District Court of Bell. Tried below before Hon. J. M. FURMAN.

Appeal from a conviction of murder in the second degree; penalty, fifty years imprisonment in the penitentiary.

The indictment charged appellant, in three counts, with the murder of Sallie Raney, on the 10th day of December, 1898; first, by ways, means, and manner and with instruments and weapons to the grand jurors unknown; second, by striking her with a hatchet and by choking, strangling, and torturing her; third, by striking, wounding, bruising, choking, strangling, and torturing her by means and manner and with some instruments and weapons to the grand jurors unknown.

The evidence in the record, briefly stated, shows that Mrs. Hamblin, the defendant, was a widow, and that she and her father lived alone up to the time of his death, which occurred a month or so prior to the transaction involved in this prosecution. After his death, being lonely, she determined to employ a female companion to stay with her. She employed two prior to the time she employed deceased and discharged them because they did not suit her. She heard of deceased, who was living some miles distant in the mountains with her brother and his family. Deceased was a young woman about 20 years of age, unmarried, but the mother of an illegitimate child some four or five months old. Mrs. Hamblin, it seems, did not know that she had this child when she went in her buggy for her; but she employed her nevertheless and brought her and her child back with her home. The record does not disclose any evidence of trouble or cause for trouble between the parties up to the time of the death of the child of Sallie Raney, the deceased. The circumstances concerning the death of the child are stated in the opinion below. Mrs. Hamblin was suspected of having killed the child, and the theory of the State was that Sallie Raney knew she had killed the child, and Mrs. Hamblin being afraid Sallie Raney would have her prosecuted for it, and testify against her, had determined to kill, and did kill, Sallie Raney. The opinion below discloses the circumstances attendant upon the information for the first time of the death of Sallie Raney by Mrs. Hamblin to J. W. Matthews, on Sunday morning, about 10 o'clock; and the appearance and condition of the dead body with the wounds and bruises upon it are also disclosed by said opinion, together with the other important facts in the case.

No further statement is deemed necessary, as the facts pertaining to each of the questions discussed in the original opinion and dissenting opinions are fully set forth.

*Pearce & Felts,* for appellant.

*Rob't A. John,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the second degree, and her punishment assessed at confinement in the penitentiary for fifty years, and she appeals.

Appellant's first assignment of error is: "That the verdict of the jury is contrary to the law and the evidence (1) because the evidence fails to establish to a reasonable and moral certainty that Sallie Raney, deceased, came to her death by violence; (2) because the evidence fails to establish to a reasonable and moral certainty the defendant's complicity in the commision of the alleged crime; (3) it is equally as probable from the evidence that the deceased came to her death from natural causes or violence accidentally inflicted on herself as by violence at the hands of the defendant." I. W. Mat-

thews, witness for the State, among other things testified: That he went to appellant's house and rang the door bell. Appellant asked, "Who is that?" Witness answered, "It is Matthews." Appellant said, "Open the door and go into the parlor; I will be in in a few minutes. I am not dressed." Witness opened the door, walked in the parlor, the northeast room, took his seat, and in about five minutes defendant came in, and, when she came in, she spoke to witness and shook hands and sat down. Witness talked to her about some business about five minutes and got up to go, when appellant said, "Mr. Matthews, did you know Sallie Raney was dead?" I said, "No, Mrs. Hamblin, I had not so much as heard that she was sick." She said, "Well, she is dead. Do you want to see her?" Witness replied, "Yes, I will go. When did she die?" Appellant said, "She died last night." Appellant walked into the front southeast room, and witness followed her. Appellant walked to a folding couch, on which the girl lay, and pulled from her face a bloody-looking cloth, saying, "She died last night. When I awoke this morning, I called to her, but she did not answer. I then got up, came to her bed, and took hold of her and shook her, and found that she was dead." Witness discovered that deceased's face was considerably bruised and looked to be swollen some. Witness turned to go out, and when he got in the hall saw some blood on the matting and on the wall near the baseboard, and a bucket of bloody-looking water, with some rags in it, sitting in the hall. Witness said to appellant, "Mrs. Hamblin, what does this mean?" And she said, "That is where she [deceased] fell yesterday evening and hurt herself, and I made her wash up the blood before she died. I guess I ought not to have done so, but I did." Witness did not notice whether the blood was dabbed on the wall or spattered. Witness asked appellant if there was anything he could do for her, and she said, "Yes, to go myself and send Dave Campbell to her at once, and asked me to telephone for her brother, D. Shofner, at Georgetown, and that I could notify Sallie's [deceased's] people if I wished." The only time accused appeared to be excited any was when she first asked witness if he knew Sallie Raney was dead. Witness returned to the house subsequently, and at that time noticed some blood on the other side of the hall on the baseboard, and saw two or three small spots of blood in the room adjoining or back of the room where the body was lying, and found several bruises on the person of the girl. Her face was bruised badly, seemed to have been beaten. On the left side of the head the skin was broken. The back of the head was badly beaten and bruised. Her clothing was wet, and there was a frozen cloth over her feet. She did not seem to be dressed as one retiring. She had on a thin, slazy dress of some kind over an undergarment. The weather was very cold, and there was snow on the ground, which had fallen on Thursday night. McT. Bush testified that he was justice of the peace of precinct No. 1, at Salado; that he held an inquest over the

body of the deceased, Sallie Raney. When he went into the house appellant was informed that he had come to investigate the death of Sallie Raney, and asked her to be sworn to tell what she knew about the matter. She was sworn and made a statement. "When she got about halfway through, she asked to see Dr. George, privately, which was refused her until she had completed and signed her statement, when I stepped aside with Dr. George and defendant, and she told Dr. George that he knew deceased had been badly ruptured during childbirth." Appellant's statement is as follows: "Miss Raney went to bed Saturday, December 9th, a little before sundown. I went to bed near dark. We were together in the room before she went to bed. Saw her no more until this morning. I sleep in this room. Don't know what time I got up this morning. Called her; she did not answer; felt her, and she was cold. Saw some one and called him to call Dr. Adams, and saw him come here and found it to be Mr. Matthews. Told him to get Mr. Campbell. It was near 10 o'clock in the day. We both sleep in this room. She was well last night except some bruises, so far as I know. Ever since her baby died she would sometimes bump her head. Once when she was cooking I saw some bruises on her head, and asked her how come it, and she said that the lattice did it. I asked her later if it was by accident. She said, 'No; but for spite.' That was I don't know how long ago, but since the baby died. I noticed yesterday morning that her head was bruised. She said that she did it in coming out of the loft with feed for horse. She was up all day yesterday, ate her breakfast, and ate dinner near 2 or 3 or 4 o'clock p. m. No one been here in this house, except Mr. Dave Campbell and Mr. Matthews. Campbell not been here in several days. No lady been here since baby died, that I remember of. (She wanted to see Dr. George privately. Not allowed.) I have heard talking at barn, and she would always say she was talking to herself. She seemed to be stiff; is always falling. She said last night that she felt tired and went to bed. Never complained of bruises hurting her. She washed her bruises and the floor with a rag and her apron, and rinsed the clothes in a bucket of water, near 1 o'clock in evening. We had just got up. She had been out to feed the horse and come in. Then I noticed that she had bruises on her, and she said that she did it on the loft floor. I think she had a fit. She has some kind of spells, but as soon as she falls she is up. She has had a few bubbles to come out of her mouth twice while spell is on. Never noticed whether her limbs were stiff or not. Neither spell lasted more than a minute or two. She always asks for her hartshorn, and is in her right mind immediately. I have a pistol and shotgun, both. Mr. Matthews was the first in the house after the discovery of death, so far as I know. The blood in hair is from bruises. The blood on rope she said was from her hands, caused from tying rope on bucket. She got up when she fell in hall. I did not help her up. I told her I would call in neighbors. She said she did not want them to know

what she had been doing. She got clothes bloody yesterday morning, and was up all day yesterday afterwards. Some of those bruises are old hurts, hurt over." Witness Bush further stated that he found deceased lying on a folding couch as indicated by the witness Matthews; that there was a bruise on one side of her face and a gash on one side of her head, just above the ear, about an inch long, and another further back towards the back of the head, and a bruise on the ear. The back of the head seemed to be badly bruised, and most of her hair was out on one side. One eye was badly bruised. There was blood on the bed. The clothes had some blood on them and were wet, with the appearance of having been washed. Her arms had the appearance of having been tied with a rope, and there were marks about her neck that looked like impressions made with a rope. "I know where the cistern is. I examined the rope at the cistern, and found it to have been freshly cut. It had blood and hair on it that resembled the deceased's hair. I saw a hatchet in the room of the house at the inquest that had a little blood and some hair on the edge. The hair was short and resembled the deceased's hair. The hatchet seemed to have been washed. When they arrested appellant late in the afternoon, he told her that she would have to go to Belton, and she asked if she could change her clothing, and she was permitted to do so." It was also shown that appellant was living at this house with the deceased, and no one else. All the circumstances show clearly, without stating them in detail, that appellant, and no one else, committed this crime. No tracks were seen going away from the house, and all the circumstances indicate that appellant had cognizance of all that was transpiring in that house with reference to Sallie Raney. Her own statement will not bear a casual inspection, but indicates a fabrication from beginning to end. We can not agree with appellant's contention, but believe that the verdict of the jury is amply supported by the law and the evidence,—pointing irresistibly to the conclusion that appellant, and no one else, committed this offense. The verdict is only tempered with the chivalrous regard the jury had for the sex of appellant.

Appellant's second assignment is "that the court erred in permitting Dr. George, Mrs. George, and Mrs. Hunton to testify, over her objections, to the circumstances of the death of the deceased's baby, as shown by bill of exceptions number 1." An inspection of this bill discloses that the only grounds of objection urged to this testimony is because "their testimony is immaterial and irrelevant." We have repeatedly held that the bill of exceptions must disclose some reason why the testimony is not admissible, and the mere allegation that the testimony "is immaterial and irrelevant" is not sufficient. Wade v. State, 37 Texas Crim. Rep., 401; McGrath v. State, 35 Texas Crim. Rep., 422. But granting the bill comes within the rule. It appears from said bill that "the State offered to prove by Dr. George the death of the deceased's baby a short time before the death of the

deceased, and also offered to prove the circumstances connected with the death of said baby. To which evidence defendant objected because of its immateriality and irrelevancy. The district attorney stated that he offered said testimony on the ground of motive. * * * And the State also offered to prove by Mrs. J. R. George, wife of Dr. George, that on the morning after Dr. George had gone over to see the baby in the evening, defendant came over after Dr. George, and, not finding him at home, told witness to tell Dr. George to come and see the baby as soon as he came. And defendant said that, while the baby seemed to be better, she [defendant] did not like the looks of the baby's eyes. While defendant and witness were talking, some one came in, and, acting upon information received, witness stepped out of her back door, and heard deceased in front of defendant's house, screaming; that witness went with defendant, and, when they arrived at the house, the baby was dead; that, before they got there, they saw or heard Sallie Raney run out of the house, and exclaim, 'My poor baby is dead.' Witness and some other ladies went in the house, took the baby's clothes off, and rubbed it. They found that it had turned a blue or purple color; that one of the ladies opened the baby's mouth, and smelled turpentine." The State also recalled Dr. George, and he testified "that the blue or purple color of the baby's body might have been caused by the air being cut off from the blood, either by choking or by putting something over its head and smothering it. It could have been caused by failure of the heart to act, or any other means that would cut off the air from the blood." Mrs. Hunton also testified that "the baby's body was a blue or purple color; that witness took deceased out on the gallery for the purpose of having a conversation with her; that while they were there on the gallery, during a period of two minutes, Mrs. Hamblin appeared or passed by them twice; that witness could not understand why appellant came about them, but she noticed that while appellant was near by deceased would not talk." Now these circumstances, as detailed, although remote, indicate, as claimed by the district attorney, the probable motive that appellant had in killing deceased. Suppose there was positive proof that appellant had killed deceased's baby; it certainly would not then be seriously contended that that fact could not be established in order to show motive for killing the deceased in order to destroy the witness to her crime. Then, clearly, any circumstance that would go to show that appellant had killed the child would have been admissible. Appellant, on her cross-examination, admits that she knew that she had been accused of killing Sallie Raney's baby, and protested her innocence to the deceased. If the bill had been properly framed, we do not think the admission of the evidence would be error; but, on the contrary, think it was properly admitted. See Brown v. State, 24 Texas Crim. App., 170; Hudson v. State, 28 Texas Crim. App., 323; Leeper v. State, 29 Texas Crim. App., 63; Hall v. State, 31 Texas

Crim. Rep., 565; Strang v. State, 32 Texas Crim. Rep., 219; Malcek v. State, 33 Texas Crim. Rep., 14.

Appellant's fourth assignment is "that the court erred in permitting the testimony of Tom Crass to go before the jury, as shown by bill of exceptions number 2." This bill discloses the following: "Tom Crass was passing appellant's house, and heard her make the statement to another lady, unknown to him (to which defendant then and there objected because said statement was not shown to have been made by defendant to deceased); and the witness testified that on Thursday afternoon, before the death of Sallie Raney, he passed defendant's house, and saw two women on the gallery,—one was defendant, but he did not know who the other woman was; that witness passed there every day, attending school, and had seen no other ladies there except defendant and this one; that they were standing close together on the gallery, and the other woman turned and went into the house; that defendant walked around on the outside of the house to where there was a large box, and I heard her say, 'Oh, now I have found your hiding place.' Witness could not say that either of the ladies was the deceased. Witness did not know deceased, but the woman he saw with defendant was a small woman, but larger than defendant." The other evidence shows that deceased was a larger woman than the defendant. This bill is in the same condition as the former bill; that is, it does not indicate wherein the testimony is objectionable. We are left to conjecture as to what appellant's objections are. Suffice it to say that we think the testimony is admissible as a circumstance—remote, it is true—going to show the feeling that appellant had towards deceased. As stated above, no one lived at the house with the appellant but the deceased; and this witness testified that they were something near the same size, but that the other woman was larger than defendant. When the witness heard the declaration that appellant made, that she had found deceased's hiding place, it indicated that deceased (if it was her) had been doing something that appellant did not like or approve of. We think that testimony was admissible. Williams v. State, 15 Texas Crim. App., 104; Preston v. State, 8 Texas Crim. App., 33; Burt v. State, 38 Texas Crim. Rep., 397; Easterwood v. State, 34 Texas Crim. Rep., 400.

Appellant's fifth assignment complains of the refusal of the court to instruct the jury, "To authorize a conviction in this cause, it should appear from the evidence beyond a reasonable doubt not only that the crime as charged has been committed, but there should also be proof, established beyond a reasonable doubt, pertinently identifying defendant with the crime beyond a mere probability or strong suspicion." We do not think this is the law; and the court's charge covered the law of circumstantial evidence in all respects.

Appellant's sixth assignment is "that the court erred in failing to submit in his charge all the issues raised by the testimony, and in failing to limit the jury in their consideration and application of the

evidence, showing and tending to show the commission of other crimes by defendant, which testimony was strongly calculated to, and probably did, injure defendant's rights before the jury." We do not think there is any merit in this assignment; nor do we think it was the province of the court to limit the effect of the testimony of the witnesses going to show that appellant had murdered the child of the deceased. See Leeper v. State and other authorities, cited supra. This also disposes of appellant's seventh assignment of error.

The eighth assignment of error complains of the failure of the court to limit and restrict defendant's testimony, brought out by the State on cross-examination, concerning the death of her husband. We are at a loss to know how this could be done. Some question was asked on cross-examination about her husband, but nothing that would tend to criminate appellant; nor was anything asked that was not in the legitimate cross-examination of appellant. When she took the stand, she thereby became subject to the same rules of cross-examination as any other witness. Quintana v. State, 29 Texas Crim. App., 401.

The verdict of the jury is amply supported by the evidence; and, finding no error in the record, the judgment is in all things affirmed.

*Affirmed.*

HENDERSON, JUDGE (Dissenting).—I agreed to the original opinion, but on the motion for rehearing appellant has made a strong assault on the action of the court affirming the case, and particularly as to the action of the court in admitting the testimony concerning the death of Sallie Raney's baby; and I have been induced to give this matter a more thorough investigation. In order to present my views I here copy the bill of exceptions which raises this question in full: "Be it remembered that on the trial of the above numbered and entitled cause the following proceedings, among others, were had: The State offered to prove by Dr. J. R. George the death of the deceased's baby, a short time prior to the death of deceased; and also offered to prove the circumstances connected with the death of said baby, to which evidence defendant then and there objected, because of its immateriality and its irrelevancy. The court asked the purpose of said proffered testimony, to which the district attorney, James P. Kinnard, who was conducting the prosecution, in the presence of the jury, replied that the purpose of said proffered evidence was to show a motive in the defendant for the crime for which she was on trial. The court then and there overruled the objection of defendant, and permitted the State to prove by said witness that he had been called to see the baby of Sallie Raney; that he was called one evening about 5 o'clock; that he did not consider the baby seriously sick, but left four powders to be given it; that he was sent for next morning about 10:30, and went over and found the baby dead,—to which evidence defendant objected, and, the court having overruled said objection,

defendant then and there excepted. Be it further remembered that the State offered to prove by Mrs. J. R. George (wife of Dr. George), the death and circumstances of said baby's death, and defendant objected for the same reasons as above set out to Dr. George's evidence on this point. The court overruled defendant's objections, and permitted Mrs. George to testify: That, on the morning after Dr. George had gone over to see the baby in the evening, defendant came over after Dr. George, and, not finding him at home, told her (Mrs. George) to tell Dr. George to come over and see the baby as soon as he came; and defendant said, further, that, while the baby seemed to be better, she (defendant) did not like the looks of the baby's eyes. That, while defendant and witness were talking, some one came in, and, acting upon information received, witness stepped out of her back door, and heard Sallie Raney, in front of defendant's house, screaming. That witness went with defendant, and, when they arrived at the house, the baby was dead. That, before they got there, they saw and heard Sallie Raney run out of the house and exclaim: 'My poor baby is dead!' That, when they got there, she (witness) and some other ladies who had come in took the baby's clothing off, and rubbed it. That they found that it had turned a blue or purple color. That, after rubbing awhile, the natural color came back. That one of the ladies opened the baby's mouth, and 'We smelled turpentine.' To which ruling of the court defendant then and there excepted. Be it further remembered that the State offered to prove by Mrs. Hunton circumstances connected with the death of said baby, and defendant then and there objected. The court overruled defendant's objections, and permitted the State to prove by said witness that she was at defendant's house on the morning of the death of Sallie Raney's baby; that she, in company with Mrs. George, examined the dead body of said baby, and found it to be blue or purple, and that they rubbed it and worked with it for a considerable length of time, trying to restore life, and its natural color came back; that she took deceased (Sallie Raney) out on the gallery for the purpose of having a conversation with her; that while they were out on the gallery, during a period of about two minutes, Mrs. Hamblin appeared near or passed by them twice; that she could not understand why defendant came about them, but she noticed that, while defendant was near by, deceased would not talk; and that she did not get to talk to deceased on the subject she wanted to,—to which ruling of the court the defendant then and there excepted. Be it further remembered that Dr. George was recalled by the State, and testified, over defendant's objection, that, in his opinion as a physician, several things might have caused the condition the baby's body was said to have been found in (that is, blue or purple); that it might and could have been caused by the air being cut off from the blood, either by choking, or putting something over its head, and smothering it; that it could have been caused by a failure of the heart to act, or any other means that would cut off

the air from the blood,—to which ruling of the court defendant then and there excepted. To all of which testimony defendant, at the time it was offered, then and there objected, because of its irrelevancy and immateriality; and, the court having overruled defendant's objections, the defendant then and there, in open court, excepted to the ruling of the court, and here now tenders her bill of exceptions," etc. I understand the opinion of the court to dispose of this question on two grounds: First, that the bill is not sufficient to raise the question; and secondly, conceding the sufficiency of the bill, that the testimony was admissible to show motive. And in this connection the statement of facts is appealed to to show the connection of appellant with the death of Sallie Raney's baby. I will treat these questions in their order.

The majority opinion insists that the word "relevant" is too general, and in this bill is without meaning. I quote from the opinion as follows: "An inspection of this bill discloses that the only ground of objection urged to this testimony is because the testimony is immaterial and irrelevant. We have repeatedly held that the bill of exceptions must disclose some reason why the testimony is inadmissible, and the mere allegation that the testimony is immaterial and irrelevant is not sufficient,"—citing Wade v. State, 37 Texas Criminal Reports, 401, and McGrath v. State, 35 Texas Criminal Reports, 422 (the opinion in the latter case being by the writer). In the latter case I note the language used was that the statement "that the testimony was irrelevant and immaterial is entirely too general." The testimony, however, appears to have been admissible, and is so treated. In the former case the same language was used, but the testimony in that case was relevant. No doubt a number of decisions can be found in which the general language, to wit, that objection to testimony that it was irrelevant, or not relevant, is stated to be too general; but I do not recall any discussion of this particular question in any case where the decision was made to turn upon the meaning of the word as applied to the evidence, though there may be such, but they have escaped my observation. Nor am I saying that there might not be cases in which the term "relevant" might be too general, and there are certainly cases in which the term "irrelevant" would not point out the objection. In the general dictionaries the word "relevant" means "to the purpose," "pertinent," "applicable," etc. In law it is defined as being any subject matter, germane to the controversy, conducive to the proof or disproof of a fact in issue or a pertinent hypothesis. "Irrelevant," the converse of this, is "having no legitimate bearing on the real question." See Cent. Dict. and Rap. & L. Law Dict. According to Stephens' Digest of Evidence, article 1, the word "relevant" means that any two facts to which it is applied are so related to each other that according to the common course of events, one, either taken by itself or in connection with other facts, proves or renders probable the past, present, or future existence or

nonexistence of the other. "The meaning of the word 'relevant,' as applied to testimony, is that it directly touches upon the issue which the parties have made by their pleadings, so as to assist in getting at the truth of it." Platner v. Platner, 78 N. Y., 90. "Although, as a rule, testimony should not be excluded as irrelevant on the ground that it may have but little weight, yet the law requires an open and visible connection between the proof and evidentiary facts and the deduction from them, and does not permit a decision to be made on remote inferences. The relevancy of evidence may be established after its admission, and evidence irrelevant when admitted may be made relevant by evidence subsequently introduced." 11 Am. and Eng. Enc. of Law, 2 ed., p. 501, and authorities there cited. Now, testing the question by the rule laid down as above, as to whether the objection presented in the bill, that said testimony concerning the death of Sallie Raney's baby was "irrelevant," let us see how the matter stands. · The State offered to prove by certain witnesses certain circumstances connected with the death of Sallie Raney's baby. Of course, said testimony was admissible, under certain circumstances, to show that the death of said baby furnished a motive suggesting that appellant killed said Sallie Raney. But, in order that this be true, there should appear some logical, visible connection between the two killings; otherwise, the former homicide is not evidence in the latter, —that is, it is not relevant. As I understand it, the bill of exceptions sets out the testimony of the witnesses in regard to the death of Sallie Raney's baby, with the environments and conditions claimed by the State to render it admissible. As presented, appellant resisted the introduction of the testimony on the ground of its irrelevancy; that is, the bill fails to show any logical or visible connection between the killing of Sallie Raney and the death of her baby. Looking at this bill, we fail to see that the testimony admitted shows that the baby came to its death by any criminal means or agency, much less by the criminal means or agency of appellant. Grouping the evidence presented, it shows that the baby was sick, evidently at the house of appellant (with whom Sallie Raney and her baby resided); that the doctor was called in to see the baby about 5 o'clock in the evening, did not consider it seriously sick, but left four powders to be given it; that he was sent for the next morning, about 10:30, and went over to appellant's house, and found the baby there dead. Mrs. George, wife of the doctor, came over to see the baby shortly before its death, but stated that she did not like the looks of the baby's eyes. She stepped out of the back door, and directly heard the mother scream that her baby was dead. They found the baby had turned blue or purple in color, and, after rubbing it awhile, the natural color came back; that one of the ladies opened the baby's mouth, and they smelled turpentine. The doctor testified that, in his opinion, several things might have caused the condition of the baby's body; that is,

the blue or purple color. It could have been caused by the air being cut off from the blood, either by choking it, or putting something over its head, and smothering it, or it could have been caused by failure of the heart to act, or any other means that would cut off the air from the blood. In this connection, Mrs. Hunton testified that, while they were out on the gallery, shortly after the baby died, talking to the mother, Mrs. Raney, appellant came about them, and she noticed that, while defendant was near deceased, Sallie Raney would not talk. This is all the evidence that it could be claimed tends in the remotest degree to show the death of Sallie Raney's baby by violence; and I submit that it is not sufficient testimony pertinently tending to show the death of said baby by violence, much less by violence committed by appellant, to go to a jury as legal testimony for the purpose of furnishing a motive against appellant for the subsequent homicide of Sallie Raney, which homicide depended wholly on circumstantial evidence. There is not only an utter failure in the bill to show the death of said baby by violence, but there is absolutely no showing that it was by violence committed by appellant; and, more than this, there is nothing to suggest that Sallie Raney, the mother, suspected defendant of being connected with the death of her baby, much less that she accused her of it. The feeble suggestion that Sallie Raney, while standing on the gallery with other persons, shortly after the death of her baby, stopped talking when appellant came near, I do not think is worthy of notice in this connection.

Now, I ask, if the objection that said testimony was not admissible because it was not relevant, or because it was irrelevant, was not sufficient, what objection should have been made to the admissibility of this testimony? The death of Sallie Raney's baby was only relevant as proof of motive. As we have seen above, this evidence could only prove motive if the baby's death was occasioned by the criminal agency of appellant, and she knew that deceased, Sallie Raney, knew of such agency, or suspected her with the death of her baby. These were essential facts to render said testimony admissible. They were affirmative facts, not shown in the bill. But the bill as presented showed clearly that said testimony was irrelevant, and in my opinion this was the only objection that could have been urged to the admission of said testimony. It was clearly irrelevant, because concerning another possible homicide; and, before proof of such other homicide could be made in this case, it was incumbent on the State to show the facts which made such other homicide relevant testimony in the case then being tried. Cheatham v. Riddle, 8 Texas, 162; Stiles v. Giddens, 21 Texas, 784. A majority of the court insist that these circumstances as detailed, "although remote, indicate, as claimed by the district attorney, the probable motive that appellant had in killing deceased," and then say: "Suppose there was positive proof that appellant had killed deceased's baby; it would certainly

not then be seriously contended that the fact could not be used in order to show motive for killing deceased, in order to destroy the witness to her crime. Then, clearly, any circumstance that would go to show that appellant killed the child would have been admissible." I can not regard this as sound doctrine. On the contrary, I insist that, before proof of another homicide can be made, there must be pertinent testimony tending to .connect the appellant on trial with some criminal agency in the perpetration of the former murder. Mr. Wharton lays down the correct rule on this subject. See Whart. Crim. Ev., secs. 37, 38; and, also, see the question discussed in Williams v. State, 38 Texas Crim. Rep., 128. But it appears to be contended that we can appeal to the statement of facts, and supplement or supply the defects in the bill; and it is said in the opinion "that appellant, on her cross-examination, admits that she knew she had been accused of killing Sallie Raney's baby, and protested her inno-cence to the deceased." I quote from the testimony adduced on the cross-examination of said witness, as follows: "No, Mr. Kinnard; I did not kill Sallie's baby by smothering it with a pillow. Pretty soon after its death I heard that I was accused with killing the baby, and Sallie told me what those ladies said about it, and I told her I did not kill her baby, and I would not have done such a thing." This is all in the record that even suggests the subject matter of the death of the baby having come up between Sallie Raney and appel-lant; and I submit that this does not convey the idea that defendant was apprehensive that Sallie Raney suspected her with the death of her baby, much less that she feared a prosecution on said account, and that Sallie Raney would be a witness against her. There is other testimony in the record showing the friendly relationship be-tween these parties; and the continuance of Sallie Raney to reside with appellant after the death of .her babe would suggest that there could be no fear on the part of appellant of Sallie Raney in regard to the death of said baby. But, as a sufficient answer to this proposition, I do not believe we are authorized to go outside of the bill of excep-tions itself. This was a case of circumstantial evidence, and every circumstance adduced against defendant on trial has more or less weight, and it is impossible to tell how much weight the testimony in regard to the death of Sallie Raney's baby, attributed, as it was, to the criminal agency of appellant, may have had with the jury. This is a dangerous character of testimony introduced against appel-lant; and the reasons for its introduction, I think, should be clearly manifest before it is admitted. It occurs to me that the case should be reversed on account of the improper admission of said testimony. Admitting that appellant is very guilty, yet she is entitled to a fair and impartial trial, and no exigency in the administration of the law should deprive her of this. It is not to be presumed that the jury will fail to discharge their duty on another trial, or that the reversal of this case is necessarily an acquittal on a subsequent trial.

But, however that may be, for the reasons advanced I can not concur in the disposition of the case as made by a majority of the court.

[NOTE.—Appellant's motion for rehearing was overruled without a written opinion.—Reporter.]