### JOHN KIPPER v. THE STATE.

#### No. 2760.   Decided December 9, 1903.

**1.—Continuance—Diligence—Materiality of Evidence.**

See opinion for facts stated, upon which it is held that no sufficient diligence is shown to have entitled defendant to a first continuance, even on a first motion therefor, and this being a second one, no error is shown, especially where the materiality of the proposed evidence is not made to appear.

**2.—Same.**

Where it is evident from the record that appellant himself could not reasonably expect the witness to testify to the facts stated in his motion for continuance, and that if he did, it would not probably be true; Held, the court did not err in overruling the motion.

**3.—Bill of Exceptions—Special Venire—Talesmen.**

Where a bill of exceptions complains that the court erred in refusing to order a special venire of 150 jurors, as requested by appellant, but did order a special venire of 100.   Held, no injury being shown to have resulted to appellant, there was no error.

**4.—Same—Original Venire—Drawing Names Out of Box by Clerk—Practice.**

Where a bill of exceptions complains that after the original venire had been exhausted and only two jurors had been selected therefrom, and the special talesmen had been brought in, it was discovered that the names of the jurors for the term were not placed in the box when the clerk drew out the special venire; and it was shown by appellant, in explanation to the bill, that the names not placed in the box were the names of jurors who had served on a former trial of the case at the same term; and also on venires drawn for two of defendant's codefendants.   Held, even conceding that the names so omitted should have been put into the box, it does not appear that such action was calculated to affect appellant injuriously, there being no suggestion that the list was not fairly drawn, or that appellant was deprived of any right thereby, especially where such course had been agreed to before the drawing commenced.

**5.—Same—Evidence—Res Gestae.**

Where it was insisted that proof that Dyson, the party arrested, and who it was proposed to rescue, was drunk and disorderly at the time he was arrested and jailed for that offense, was improperly admitted; that it was proof of another offense, by parol, which was of record; Held, not to be proof of another and separate petty offense, but was a part of the res gestae, and the occasion of the attempted rescue, and hence not injurious to appellant.

**6.—Same—Bill of Exceptions.**

A bill of exceptions, in so far as the conditions under which the testimony was admitted, should be complete within itself, and the facts should be shown in the bill.   Held, a ground of objection urged, reciting conditions alone is not a certificate of the judge that such objections were in fact true as to the conditions recited.

**7.—Distance—Time—Opinion Evidence.**

Distance and time are authorized to be given as matters of opinion.

**8.—Same—Admissible Evidence.**

Where it was shown by witnesses for the State that at a certain hour of the night of the homicide they observed a body of men, apparently armed

and riding bicycles, on their way to the city of El Paso, from the direction of Fort Bliss; also by some of the witnesses that they observed men on the road whom they took to be soldiers returning that morning from the city of El Paso, going in the direction of Fort Bliss; Held, while appellant and the others were not identified by these witnesses, yet the evidence being a circumstance tending to show that a body of armed men went from the post to El Paso and returned therefrom about the time stated by the other witnesses that appellant and his confederates made the trip, the same was admissible.

**9.—Same—Conspiracy—Evidence of.**

Where it was shown, as evidence of a conspiracy, that after the return of the parties to the post, or at the time when they should have returned from the city, that they made certain disposition of guns, or that guns were out of the racks where they belonged, and that appellant and certain members of the party were seen pulling off their fatigue suits after their return to the post, and which they were shown to have worn on the trip to the city; Held admissible as tending to prove the conspiracy, and an attempt to hide the evidence of guilt connecting appellant and his confederates with the transaction, or offense committed in the city.

**10.—Same—Declarations of Codefendants.**

The fact that they were seen, in the early morning, pulling off their fatigue suits, putting them away, etc., was part and parcel of the transaction tending to connect all the parties therewith as confederates with appellant, the evidence as to him being positive, through the declarations of one of his confederates that he was at the jail that night at the time of the homicide.

**11.—Same—Evidence—Objection to—Practice.**

Where a witness for the State testified that he was authorized by the district attorney to offer immunity from punishment to any one who would disclose the facts pertaining to the murder, and same was objected to as incompetent, and the court below explained that the testimony was developed on re-examination of said witness after having been asked a number of like questions by appellant on cross-examination; Held, under the explanation, competent.

**12.—Negative Evidence—Prejudice.**

Where, in answer to certain questions, as to his attempt to get a certain party to swear falsely in regard to appellant's case, the witness replied, "That he did not." Held, the answer being of a negative character, it was not calculated to prejudice appellant.

**13.—Evidence—Dying Declarations—Harmless Error.**

The testimony of the father of deceased as to what was said by the son to his mother when he was carried into the room and laid on the bed, viz., "They have got me," was admissible as dying declarations; or, if not, was harmless error.

**14.—Impeachment of Witness—Evidence to Sustain.**

Where a witness has been impeached by showing him to have made contradictory statements to his evidence on the trial, it was competent to sustain such witness by showing that shortly after the event, or before any inducemen was held out to him to state the matter falsely, he had made a statement agreeing with that delivered on the stand.

**15.—Charge of Court—Weight of Testimony.**

Where the court charged the jury that the impeaching testimony admitted "was solely for the purpose of aiding them in passing on the credibility of the witnesses named, and in determining the weight to be attached to the evidence of said witnesses;" Held, not to be a charge on the weight of evidence.

**16.—Same.**

Where there is no danger that testimony will be misappropriated by the jury, no charge thereon is required.

**17.—Same—Murder in Second Degree.**

Where, from all the evidence in the record, there is nothing to indicate that the purpose formed in the minds of the conspirators was not cool and deliberate, and there being no evidence, from the State's theory of the case, to mitigate or lessen the degree of homicide from murder in the first degree, Held a charge on a lesser degree was not warranted or called for.

Brooks, Judge, dissents from this proposition, holding that the record does show that murder in the second degree was an issue on the trial, and that the court should have given a charge applicable to that degree.

Appeal from the Criminal District Court of Dallas. On change of venue from El Paso County. Tried below before Hon. Charles F. Clint.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

This is the second appeal in this case. The former appeal, which was taken from the trial of the case before the District Court of El Paso County, will be found reported in 42 Texas Criminal Reports, 613, and a short but sufficient statement of the case having been there given, the same is hereby referred to, and no further statement of the facts is deemed necessary.

As stated, this case was triel once before in the District Court of El Paso County, Texas, at the April term of said court, 1900, and the defendant was convicted, and appealed from said conviction and judgment to the Court of Criminal Appeals of Texas, and his case was reversed and remanded. The indictment upon which said conviction and judgment was had having been quashed, the defendant was reindicted in this cause in the District Court of said El Paso County, Texas, at the January term thereof, 1901, and at a later day in said term made a motion in said court to change the venue of his cause from the said District Court of El Paso County to the Criminal District Court of Dallas County, Texas, which said motion was granted and a trial upon the indictment herein had in the said Criminal District Court of Dallas County at the July term, 1901, thereof, resulted in a mistrial, and six days after the jury was discharged by the court because of their inability to agree upon a verdict, and at the same term of said court the defendant was rearraigned before said court and tried again and was convicted, and the jury assessed his punishment at imprisonment in the penitentiary for life, from which judgment and conviction the defendant appeals.

*P. M. Stine, Albert Walker,* and *R. B. Allen,* for appellant, filed an interesting brief in the case, and also filed a motion for rehearing, which was overruled.

*Howard Martin,* Assistant Attorney General, for the State. [No brief for the State found in the record.—Reporter.]

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life; hence this appeal.

There are about seventy-five bills of exception in this record; some of them are quite lengthy, and a great many upon questions that are absolutely unimportant or that have frequently heretofore been decided adversely to appellant. As to some of the propositions contained in the bills, a number contain the same question in effect. Really all that is important could have been condensed and put into a dozen bills of exceptions. In discussing the questions presented in these numerous bills, we will condense as far as possible, treating only such matter as

we deem necessary, and if any question is omitted it may be considered that we do not deem the exception taken of any significance so far as the appeal is concerned.

On the trial the State relied on murder in the first degree, claiming that the homicide was committed in pursuance of a conspiracy or agreement on the part of appellant and some eight companions, all of whom, at the time, were colored soldiers belonging to Company A, Twenty-fifth regiment, stationed at Fort Bliss, some five miles northeast from El Paso. The State showed substantially that the conspirators were appellant, Kipper, a sergeant in said company; George McElroy, William H. Powell, and James H. Hull, corporals; Davis, Roberts, Carroll, Wright and Elazer, who were privates. That on the evening of the 16th of February, 1900, Samuel Dyson, a member of said company, was arrested by a policeman on the streets of El Paso, on a charge of being drunk and disorderly, and imprisoned in the city jail; some time about 2 o'clock on the morning of February 17th appellant and Davis went to the jail in order to get Dyson out. They did not succeed. It is then shown that appellant and his companion returned to the post at Fort Bliss, riding bicycles; that they aroused the other parties heretofore named, and they all procured arms, getting Krag-Jorgenson rifles and ammunition, also two axes out of the barracks, declaring that they intended to go to town (El Paso) and release Dyson, who was confined in jail. They rode on their bicycles to town. Two of the party, to wit, Elazer and Wright, dropped out on the way. The others proceeded to the jail where Dyson was confined. Some of them entered the jail. The jailer, Blacker, was aroused, and also deceased, Newton Stewart, a policeman; and immediately the firing began, both on the inside and outside of the jail. Blacker relates that he was aroused by hearing the scuffle of feet in the front office, he sleeping in the room back thereof; that he immediately waked up and saw a negro soldier standing in the front office, back of the desk; that he grabbed his pistol, which was lying by his side, and shot at the negro. The party retreated, and he (witness) immediately left the building through a window. In the meantime there was shooting in the front.office and on the outside. Deceased, Stewart, was in the front office, and after the melee, when witness returned to the office, he found Stewart down on the floor, suffering from two gunshot wounds, one in the front and one in the shoulder. There were several bullet holes in the front office, and one or two bullet holes through the front window. The facts tend to show that one of the shots fired through the window must have struck deceased, Stewart. This occurred between 4 and 5 o'clock in the morning. After other parties gathered Corporal Hull was found dead in the street near the jail, caused from a gunshot wound; and four or five Krag-Jorgensen rifles were found in and around the jail, and two axes—all belonging to the government station at Fort Bliss. In order to connect appellant with the homicide, the State made use of the testimony of Powell, one of the accomplices; and

in support of his testimony as to what was done by the conspirators, and as to the presence of appellant at the time, a number of circumstances, coming through other witnesses, were shown. Appellant pleaded not guilty, and relied mainly on an alibi. This is a sufficient statement of the case in order to discuss the issues presented.

Appellant made a motion for continuance on account of the absence of Grant Bryant, who was alleged to reside in Davidson County, Tennessee. We will state here that defendant was indicted in El Paso County, on April 6, 1900, and was tried at the April term of said court. Said witness was subpoenaed at said trial, and testified. The case was appealed to this court and was reversed and remanded. 42 Texas Crim. Rep., 613; 2 Texas Ct. Rep., 411. At the April term, 1900, of the District Court of El Paso County, said cause was dismissed and defendant reindicted. Subsequently, at the June term, 1900, the venue was changed to Dallas County. It does not appear that after the second indictment was presented said witness was summoned in this case. Appellant attempts to excuse the want of diligence by reciting that the witness was discharged and denied re-enlistment about this time in the company; that he left El Paso, and the commandant, or parties at the post, interfered with appellant securing jurisdiction of said witness and that he had since been unable to find out where the witness was, until about the time of the convening of court in Dallas, in August, 1901, when he propounded interrogatories to him and forwarded them to Nashville, Tenn. We do not believe the facts related show sufficient diligence on the part of appellant to ascertain the whereabouts of said witness during the interim between the dismissal of the first case and the trial of the second at Dallas. Moreover, in this connection, it is not shown that this is the first application for continuance. A previous application had been made at the first trial of the case at Dallas, there having been two trials of the case there, the first trial having occurred about the last of July, and the jury having been discharged for failing to agree. At that time an application for continuance was made, and this is the second application, and must be treated as such. It is shown that the depositions of said witness were forwarded to Nashville, Tenn., on the 8th or 9th of August, but it is not shown in that connection that any funds were forwarded with same. It is merely shown that defendant stated his friends provided and furnished all necessary funds to pay the expense of taking said depositions. There is no showing in this application that said witness really resided in Davidson County, Tennessee. It does not occur to us that there was sufficient diligence shown to have entitled him to a continuance on a first motion, much less a second. Moreover, it does not occur to us that the testimony of said witness was material. What he proposed to prove by him was in impeachment of the witness Henry Freeman, as to what Henry Freeman testified in regard to seeing appellant taking off his fatigue trousers on the morning of the 17th at the empty barracks at Fort Bliss—said witness Freeman having testified for the

State that he looked from the window on the east side of the hospital building, in the north end of said building, and saw Kipper at the canteen or empty barracks pulling off his trousers, about 6 o'clock in the morning of the 17th of February. Appellant says he expects to prove by the absent witness that he was present with said Freeman in the hospital building, and that he did not 'go to the window and look out. However, in addition to this, appellant stated he expected to prove that said witness went to the window himself, looked out and recognized the party whom Freeman testified about to be one Elmo Sears, a private in said Company A, and not Kipper. In this connection we would observe that appellant introduced Sims, who testified that Freeman did not go to the window and look out as he swore. So this being the second application, the testimony would be cumulative as to that matter. But this witness himself testifies that he went to the window and looked out, and he took the man to be Kipper; so that, we take it, appellant could not reasonably expect his witness to testify to the facts stated, and if he did, it was not probably true. Consequently, we do not believe the court erred in overruling appellant's application for continuance.

In the second bill of exceptions appellant complains that the court refused to order a special venire of 150 jurors as requested by him, but instead ordered only 100. No injury is shown to have resulted to appellant from this. Nor is any error shown in the instruction of the court to the sheriff in summoning talesmen.

Complaint is made as to the method of drawing the jury out of the box by the clerk. This question seems to have been raised after the original venire was exhausted, and only two jurors had been selected at the time when special talesmen had been brought in. Appellant's attorneys say that they first discovered the names of the jurors for the term were not placed in the box when the clerk drew out the special venire. It is shown by the court, in his explanation to the bill, that the names not placed in the box were the names of jurors who had served in appellant's former trial at the same term and venires drawn for two of his condefendants, Leroy Roberts and W. H. Davis. It does not occur to us that this action of the court was calculated to affect appellant injuriously, even if it be conceded that the jurors who had served in appellant's former case and in two cases against his codefendants should have been placed in the box. There is no suggestion that the list of jurors was not drawn fairly, or that appellant was deprived of any right by the failure to place the names of said other jurors in the box. Besides this, in the affidavit of the attorneys representing appellant it seems the course adopted by the clerk was agreed to and indorsed by them, until it was ascertained that the men drawn on the special venire appeared to live almost entirely in two neighborhoods in Dallas County.

It is insisted that the testimony adduced by the State to the effect that Dyson, the party arrested on the streets of El Paso and placed in jail, was drunk and disorderly at the time, and was arrested and jailed for

that offense, was improperly admitted. This was objected to on the ground that it was proving another offense, and was proof by parol of a fact which was of record. It was not proof of another offense not connected with this case, but was a part of the res gestae and the occasion of the attempted rescue. It does not appear that there was any written complaint or other record testimony of the offense in the bill of exceptions. The objections stated in the bill are not certificates of facts. We can see no injury that could possibly result to appellant by proving the person attempted to be rescued was charged with simply a petty offense, for being drunk and disorderly. It is true it was immaterial what he was placed in jail for, but the fact that he was placed in jail for a petty offense could not injure appellant. If he had been placed in jail for a much graver offense there might be some question. The offense for which he was confined being immaterial, it was equally immaterial as to whether or not he was ever tried for it. Of course, what was done after the homicide as to Dyson's case, would not be admissible for appellant.

Certain questions and answers are embodied in bill number 15, with reference to the examination of the witness Powell. The effect of these questions and answers was to show witness Powell had been indicted for the same offense, and that he came to be a witness against appellant by having told what he knew about it; that no promise had been made to him by Captain Loughborough to induce him to testify against appellant. Then follows the objection urged to this testimony, to wit, "that it was irrelevant, immaterial, and that it was not proper for the State to show how he came to be a witness in the case; and because the testimony was calculated to prejudice the jury against defendant, and was introduced by the State during the examination in chief of said witness, and prior to the time defendant had introduced any testimony in said case, for the purpose on the part of the State of establishing the credibility of said witness, and showing he was worthy of belief." Now, it has been held, that a bill of exceptions, so far as the conditions under which the testimony was admitted, should be complete within itself, and the facts should be shown in the bill; and a ground of objection urged, which recites conditions, is not a certificate on the part of the judge that such objections were, in fact, true as to the conditions therein recited. Hamblin v. State, 50 S. W. Rep., 1019; White's Ann. C. C. P., sec. 857. Of course, circumstances can readily be imagined under which it was admissible to have elicited the testimony complained of from the witness Powell. His cross-examination may have been such as to have authorized it, or some attempt to impeach him may have been made. If the statement of facts, in connection with the bill, had shown that this testimony was elicited in chief, and when no assault had been made on the witness, it may not have been admissible; still, it does not occur to us that the testimony was hurtful. It is not shown here that the witness testified that he made any particular statement to Captain Loughborough, or to

anyone else. The same observations here made apply to bills numbers 29 and 31.

We believe it was competent for State's witness George Harris to give his best opinion as to the distance between the place where he was standing guard. and the soldiers' quarters. Nor was it improper for him to give about the time he thought it was. Distance and time are authorized to be given as matters of opinion. Lawson, Exp. and Opin. Ev., p. 460. We hold it was competent for the State to show, by the witness Daley and others, that at a certain hour of the night of the alleged homicide they observed a body of men, some seven or eight, who appeared to be armed and riding bicycles, on their way to the city of El Paso from the direction of Fort Bliss. And also, that some of the witnesses observed men on the road, whom they took to be soldiers, returning that morning from towards the city of El Paso, in the direction of Fort Bliss. True, appellant and others were not identified by these witnesses; yet the evidence here offered was a circumstance tending to show that a body of men, about that hour of the night, who appeared to be armed, went from the post to El Paso, and returned therefrom about the time stated by other witnesses; especially witness Powell, that appellant and his confederates made the trip from the fort to the jail. The evidence was admissible.

We believe it was admissible to show, after the parties, or any of them, returned to the post, or should have returned from El Paso, what disposition was made of the guns, if any; or that guns were found out of the rack where they belonged. Evidently the object of the conspiracy, if one was entered into, comprehended both going to El Paso and releasing the prisoner, and then returning to the post and disposing of any evidence of guilt connecting appellant and his confederates with the transaction. And this also applies to what Carroll and others may have done with reference to pulling off their fatigue suits after their return to the post. They were shown to have worn these fatigue suits to El Paso on the expedition. It was not usual for them to wear the same at reveille, or unless some special duty requiring the wearing of fatigue suits. The fact that they were seen in the early morning, by the time it was light, pulling off their fatigue suits, putting them away, was a part and parcel of the transaction tending to connect all of such parties therewith as confederates with appellant Kipper; and as to him the evidence is positive, through witness Powell, one of his confederates, that he was at the jail on that night at the time of the homicide, and it was also proven that appellant was seen to pull off his fatigue suit after his return. "Declarations or conduct of a codefendant, made after the consummation of the offense, and when defendant was not present, is evidence where the testimony connects them in the perpetration of the crime, if the fact testified to would tend to prove the guilt of the codefendant then on trial, as, for instance, the subsequent finding of the weapons or means used in the commission of the homicide in the house or possession of the codefendant." Pearson v. State, 18 Texas Crim. App., 524; Rodriquez v. State,

32 Texas Crim. Rep., 259. And in Clark v. State, 28 Texas Crim. App., 189, it was held competent for the State to prove that ten days subsequent to the robbery a part of the fruits of the robbery were found in the possession of defendant's coconspirator.

There are several bills of exception in regard to the admission of testimony concerning these fatigue suits and their custody and identity. We have examined the same, and in our opinion the objections go to the weight but not to the admissibility of the evidence.

Objections were made to the testimony of Loughborough, to the effect that he was acting in the line of his duty as an officer when he undertook to do what he did to help the civil authorities by turning over the parties to this crime, and that his sole purpose was to ascertain, if possible, who had left the post and gone to El Paso and murdered Newton Stewart, the policeman, and to arrest them; that that was his sole purpose. The objections to this testimony are, that it was immaterial and irrelevant, and that it was simply an opinion and conclusion of the witness; and that it was not proper for the State to corroborate and bolster up the character of the witness by the testimony above set forth. The objections as to the immateriality and irrelevancy of the evidence has been held not sufficient to raise the question as to the admissibility thereof. Hamblin v. State, 50 S. W. Rep., 1019. And it is not shown that this evidence was not adduced in legitimate examination of the witness after he had been cross-examined. The bill shows that it was on redirect examination of the witness. Further than this it is not shown that the witness testified to any fact injurious to appellant.

Nor was it incompetent to prove by witness Loughborough that the district attorney of El Paso County had given him authority to offer immunity from punishment to any person who would disclose the facts with reference to the murder of Newton Stewart. As explained by the court this testimony was on re-examination of said witness, after he had been asked a number of questions of like character by appellant on cross-examination. Nor was there any merit in appellant's contention that the court erred in allowing Loughborough to explain how it was he may have paid $5 toward the prosecution.

Again, appellant objected to the redirect examination on the part of the State of said witness to the effect that he did not at any time or in any way keep the persons charged with the offense from making their defense, and that he afforded M. W. Stanton, Esq., who defended said parties, all facilities in his power to aid him. This may have been admissible in the re-examination of said witness after appellant had attempted to break him down by showing acts and conduct attempting to interfere with appellant or his counsel. Furthermore, the court certifies this evidence was brought out in explanation of defendant's cross-examination, also in contradiction of Wright and Yarbrough.

On the cross-examination of Boyer Wright, witness for defendant, it was permitted to be shown that he knew Arthur Taylor, and the State

45 Crim.—25.

then attempted to show that he (Wright) tried to get Arthur Taylor to tell a lie in court in regard to' appellant's case. Witness answered that he did not. It is sufficient to say that the answers of the witness were of a negative character, and not calculated to prejudice appellant.

While witness Ben F. Carroll, for defendant, was on the stand, on cross-examination he stated that he had been convicted at El Paso for this offense, and that the case against him had been dismissed in Dallas County. This was objected to on the ground that it was wholly immaterial and irrelevant. We believe it was competent evidence as going to his credit. It also having been shown by defendant that Carroll taught school at the post and loaned money to the soldiers, it was not improper for the State on re-examination to show the rate at which he loaned such money; at least the answer of the witness was not injurious to appellant.

With reference to the testimony of Milton Chisum, regarding a telegram said to have been received by him from Sam E. Dyson, objection that same was immaterial does not raise any question. Besides, the contents of said telegram is not shown and could not possibly injure appellant.

It does not occur to us that the bill shows there was any contingency for proof to establish the reputation for truth of the witness Dr. Beard. The statement of the facts in connection with said bill does not show that he was impeached by the State. The fact that he was contradicted by Loughborough and Freeman would not of itself authorize his being bolstered up, unless the bill had shown, in this connection, that he was a stranger in that locality.

We believe the testimony of W. T. Stewart, with reference to what his son said to his mother when they carried him into the room and laid him on the bed, was admissible as dying declarations. At any rate it was harmless error. He merely said, "They have got me."

With reference to bill number 18, we hold it was competent, as explained by the court, for the State on re-direct examination of the witness Taylor to show that he had previously made a statement corroborating and. agreeing with his testimony delivered on the stand and the circumstances connected therewith. This was after it had been shown on his cross-examination by appellant that he had made different statements and testified differently in reference to the transaction. When a witness has been impeached by showing that he has made contradictory statements to his evidence on the trial, it is competent to sustain the witness by showing that shortly after the event, or before any inducement was offered for him to state the matter falsely, he had made a statement coinciding with his testimony delivered on the stand. This also disposes of bill number 32, as explained by the judge. The statement was offered to corroborate the witness Taylor, after appellant had attacked him by showing that on the former trial of the case, he (Taylor) had testified that he did not know whether the person he had seen passing in at the post at 2:30 was Kipper or not. Under the circumstances

it was competent to show that he had made a sworn statement shortly after the event in which his testimony on that point coincided with the testimony given on the trial.

Appellant reserved a number of exceptions to the remarks of the court during the trial. We have examined the same, and in our opinion there is no merit in his contentions.

Bill number 51 appears to have been drawn by the court in lieu of one presented to the court by appellant. We understand from it that Loughborough testified that "Sims' only reply to said statement of said Petrick was that he would not be certain who it was." This statement in this bill would not show that the witness was impeached upon irrelevant or immaterial matter, but would simply show a failure to impeach him, even if it be conceded that the matter was hearsay.

We do not see how it could prove hurtful to appellant to show, as was done, by witness Loughborough that Elmo Sears was absent and he had not seen him since September 27, 1900; and that he was a witness in the Kipper case when it was tried in El Paso. For aught that appears this may have been legitimate testimony on the part of the State after said witness had been cross-examined by appellant. As explained by the court, appellant's bill of exceptions number 45 is not well taken. The court properly admitted the testimony of Edward Whitrow as to that part of the conversation which he heard between Boyer Wright and Arthur G. Taylor. Taylor testified as to the whole conversation, and Whitrow testified that he heard Boyer Wright tell Taylor "that he wanted him to be doubtful," and he understood from that connection that it was something in reference to the case he wanted him to be doubtful about. We think the objections go to its weight rather than to its admissibility.

Appellant reserved several exceptions to the court's charge and also requested a number of charges which were refused, and he saved his bill of exceptions. We do not think it was incumbent on the court to. charge on alibi further than was done in the main charge. Nor was it necessary that the court should give the requested charges on accomplice testimony. The charge of the court was full and fair on this subject. The court gave a sufficient charge covering the witnesses whose testimony it was required to limit. The court instructed the jury that said impeaching testimony was admitted before them solely for the purpose of aiding them in passing on the credibility of the witnesses named, and in determining the weight to be attached to the evidence of said witness. This was not a charge upon the weight of the testimony.

Nor was the court required to give special requested instructions with reference to the impeachment of Annie Parker by Chisum. This was original testimony on the part of both witnesses. They contradicted each other concerning. a fact admissible in evidence. The same may be said as to the witness Fannie Reed's evidence, in contradiction of the witness Davis. Davis said he slept with Beaulah, who was living at Fannie Reed's, part of the night of the homicide. Fannie stated that no

such woman as Beulah was living with her at the time. She merely contradicted him as to a fact testified to by him; and there was no danger of her testimony being used by the jury for any other purpose. There was no objection to Powell's evidence in impeachment of B. F. Carroll on the ground that it may have transpired subsequent to the conspiracy. However, we think the testimony was admissible. Clark v. State, 28 Texas Crim. App., 189; Pearson v. State, 18 Texas Crim. App., 524. It being original evidence on the part of Powell, his contradiction by Carroll as to the fact did not require a charge thereon.

Nor was the court required to instruct the jury as to the testimony of Loughborough concerning the statement of Arthur C. Taylor. The testimony of Loughborough merely showed that Tayler made the same statement to him that he testified to on the trial. This testimony was admitted to corroborate Taylor after an attempt had been made to impeach him by defendant. There is no danger that the testimony would be appropriated for any other purpose by the jury, and the court was not required to charge thereon. There was no occasion, so far as we have been able to discover from the statement of facts here, for the court to instruct the jury that they could not convict defendant of an assault with intent to murder.

Nor was there anything in the testimony requiring the court to give the requested charge on the acts and conduct of other conspirators, in the absence of appellant. The testimony on the part of the State is positive that appellant was present with the other conspirators and participated in the homicide, and the court gave a sufficient charge on principals.

Appellant also excepted to the court's charge because it failed to define express malice and implied malice. It occurs to us that the charge here defining express malice is in accord with the authorities. It is a better definition of express malice than was approved by this court in Stevens v. State, 42 Texas Crim. Rep., 154. The court did not define implied malice at all. If by this it was intended to raise the question of the failure of the court to charge on murder in the second degree, we do not think it sufficiently does so. Concede, however, that the question as to whether the court should have given a charge on murder in the second degree is sufficiently presented (and we understand the rule to be, if there is a doubt as to whether the killing was upon that cool deliberation which characterizes a murder upon express malice, it is the duty of the court to charge upon murder in the second degree—Smith v. State, 40 Texas Crim. Rep., 391), let us see the shape of the case on this proposition.

The evidence here establishes beyond any question that appellant and the other parties named conspired together to go from their barracks to the city jail in El Paso, and there release one Dyson, who was confined in said jail on a charge of misdemeanor. Now, if their design embraced within its scope the determination to use whatever force might become necessary to consummate their purpose, even to the taking of human life, then all the parties engaged in the conspiracy, and who were present at

the time, were guilty of murder.  See Mercer-Smith v. State, 8 Texas Crim. App., 211; Kirby v. State, 23 Texas Crim. App., 13; Bowers v. State, 24 Texas Crim. App., 542.  As was said in Kirby's case, supra, "The joint responsibility of parties for each other's misconduct rests on the principle that when an act is committed by a body of men engaged in a common purpose such act is treated as if specifically committed by each individual.  It should be observed, however, that while parties are responsible for collateral acts growing out of the general design, they are not responsible for independent acts growing out of the particular malice of individuals.  Thus, if one party of his own head turn aside to commit a felony foreign to the original design, his companions do not participate in his guilt.  But it is equally as well settled that 'all combining to commit an offense, to which homicide is incident, are principals in the homicide.  As where persons combine to stand by one another in a breach of the peace, with a general resolution to resist all opposers, and in the execution of their design a murder is committed, all of the company are equally principals in the murder, though, at the time of the fact, some of them were at such a distance as to be out of view, if the murder be in the furtherance of the common design.  *  *  *  Malice in such a killing may be inferred as a presumption of fact from the nature of the design and the character of the preparation; whether the deceased fell by the hand of the accused or otherwise is immaterial.' " And see 1 Russell on Crimes, pp. 342, 343.

Evidently from this record the parties not only contemplated releasing the prisoner Dyson from the jail, but they also apprehended opposition. They expected that it might become necessary to break the jail, and so they carried axes.  They further believed that they would be resisted in their attempt, and they armed themselves with guns, Krag-Jorgensen rifles, with which to overcome resistance.  Appellant, who was the leader of the party, had been to the jail before, and was there denied permission to go to the cell of the prisoner, and he had reason to believe that in their attempt to enlarge the prisoner they would be opposed.  So that, beyond controversy, the conspirators contemplated the use of deadly weapons to overcome opposition.  It can not be said that their design was simply to slip into the jail and release the prisoner.  And it is not like a case where parties intended clandestinely to release a prisoner, and they are apprehended in the act, set upon by the jailer, and one of the parties suddenly, without deliberation, and in order to effect his escape, should pick up a club and kill the jailer.  In such case it might be murder in the second degree.  But here the parties evidently intended to overcome resistance at all hazards, and they prepared for such a contingency.  Did they do so in the calm and deliberate state of mind and under circumstances which indicate they contemplated the natural result of their attempt, so as to characterize the homicide committed as murder upon express malice?  To quote from the decision of Judge Roberts in McCoy v. State, 25 Texas, 33, defining express malice, he says:  "Malice in fact

(express) is a deliberate intention of doing any bodily harm to another whereunto by law he is not authorized. The evidence of such a malice must arise from external circumstances, discovering that inward intention, as lying in wait, menacings antecedent, former grudges, deliberate compassings and the like, which are various according to variety of circumstances." And again: "It may be concluded, then, in determining whether a murder has been committed with express malice or not, the important questions are, do the external facts and circumstances at the time of the killing, before or after that time, having connection with or relating to it, furnish satisfactory evidence of the existence of a sedate, deliberate mind, on the part of the person killing, at the time he does the act? Do they show a formed design to take the life of the person slain, or do him some serious bodily harm, which in its necessary or probable consequences may end in his death; or such general, reckless disregard of human life as necessarily includes a formed design against the life of the person slain? If they do, the killing, if it amount to murder, will be upon express malice."

Now, testing this question by the rule laid down, there can be no doubt that the parties, including appellant, contemplated in the first instance a felony; that is, release from the jail of the prisoner Dyson; not only so, but they expected to be resisted, and they prepared themselves with the latest improved weapons of warfare to overcome that resistance, thus manifesting a determination to shoot down any person who might oppose them in their design. They had ample time to deliberate in regard to this. There is no evidence of excitement on their part, every step being taken with military precision. In order to expedite their march to the appointed place, and to make good their retreat, they mounted bicycles and proceeded to the jail where the prisoner was confined. While some stood on the outside others entered the jail. Immediately, as soon as they were resisted, they opened fire on the jailer, both from within and without the jail, inflicting on him two mortal wounds which caused his death. There is nothing in the record to indicate that their purpose was not formed when the minds of the conspirators were cool and deliberate; and if the State's theory be correct there is nothing to mitigate or lessen the degree of this homicide below that of murder in the first degree. According to appellant's theory he did not place himself in contact with the homicide. He made no defense as to its diabolical character, but claimed and offered testimony to show that he did not participate in the homicide. Evidently the jury did not believe his theory, but believed he was present and was the moving spirit of the enterprise, as they had a right to do from the testimony. His presence at the scene of the homicide and his participation therein was properly proven by his accomplice and confederate Powell, and his evidence was amply supported by facts and circumstances proven by other witnesses. The jury were amply warranted in believing the theory of the State and disbelieving the theory offered by defendant; and when they found his alibi was not true, there

was nothing in the case to authorize them to find appellant guilty of a less offense than murder in the first degree. Henry v. State, 38 Texas Crim. Rep., 350; Ransom v. State, 6 Texas Ct. Rep., 259; and for other authorities see White's Ann. P. C., secs. 1228, 1229.

After what has been said it is not necessary to discuss the charge of the court as applied to the facts of the case. He simply instructed the jury, in effect, that if appellant, with the other parties named, or any of them, agreed to arm themselves with rifles and axes for the purpose of going to the jail and freeing Dyson therefrom by whatever force or means might become necessary to effect that object, and in pursuance of such agreement and purpose, the defendant with all or any of the parties named did arm themselves with rifles and go to the jail of El Paso for the purpose of releasing said prisoner Dyson, and that appellant, or any of said party, in pursuance of said previous design, with express malice shot and killed said Stewart with a gun, appellant would be guilty of murder in the first degree, whether or not he in point of fact fired the fatal shot.

We have examined the record carefully, and in our opinion there was no error committed in this case authorizing a reversal thereof. The judgment is affirmed.

*Affirmed.*

Brooks, Judge, dissents on the ground that murder in the second degree was an issue on the trial, and the court should have given in charge law applicable to that degree of murder, the record showing that issue.